# EXHIBIT 12

# (PART 1 OF 2)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

| CONTROL NO. | FILING DATE | PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/001,001 | 09/07/2007 | 7,145,902 | |

NOVAK DRUCE & QUIGG, LLP
1300 EYE STREET NW
SUITE 1000 WEST TOWER
WASHINGTON DC 20005

| | EXAMINER |
|---|---|

| ART UNIT | PAPER |
|---|---|

**DATE MAILED:**

11/27/07

## *INTER PARTES* REEXAMINATION COMMUNICATION

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this communication.

| **ORDER GRANTING/DENYING** | | |
|---|---|---|
| **REQUEST FOR INTER PARTES REEXAMINATION** | 95/001,001 | 7,145,902 |
| | **Examiner** | **Art Unit** |
| | Ovidio Escalante | 3992 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

The request for *inter partes* reexamination has been considered. Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s):    ☐ PTO-892    ☒ PTO/SB/08    ☒Other: Decision

1. ☒ The request for *inter partes* reexamination is GRANTED.

    ☒ An Office action is attached with this order.

    ☐ An Office action will follow in due course.

2. ☐ The request for *inter partes* reexamination is DENIED.

This decision is not appealable. 35 U.S.C. 312(c). Requester may seek review of a denial by petition to the Director of the USPTO within ONE MONTH from the mailing date hereof. 37 CFR 1.927. EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183. In due course, a refund under 37 CFR 1.26(c) will be made to requester.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Order.

| *OFFICE ACTION IN INTER PARTES REEXAMINATION* | Control No. | Patent Under Reexamination |
| | 95/001,001 | 7,145,902 |
| | Examiner | Art Unit | |
| | Ovidio Escalante | 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on _____
Third Party(ies) on _____

**RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:**

*For Patent Owner's Response*:
    2 MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response:*
    30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

**PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☒ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II.  SUMMARY OF ACTION:**

1a. ☒ Claims <u>See Continuation Sheet</u> are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable. [Amended or new claims]
5. ☒ Claims <u>See Continuation Sheet</u> are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____    ☐ are acceptable    ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:    ☐ approved.  ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
       ☐ been received.    ☐ not been received.    ☐ been filed in Application/Control No <u>95001001</u>.
10. ☐ Other _____

**Continuation Sheet (PTOL-2064)**

Continuation of SUMMARY OF ACTION: 1a. Claims subject to reexamination are 36,37,41,54-58,60-
62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125.

Continuation of SUMMARY OF ACTION: 5. Claims rejected are 6,37,41,54-58,60-62,64,66,68,69,71,75,77,79,82,84,87,90-
92,95,98,100,102,104 and 118-125.

## DECISION GRANTING *INTER PARTES* REEXAMINATION

1.      A substantial new question of patentability affecting claims 36,37,41,54-58,60-

62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of United States

Patent Number 7,145,902 (Schindler et al. patent) is raised by the request for *inter partes*

reexamination.

        This decision is in response to the corrected request for *inter partes* reexamination filed

on September 7, 2007 and the decision vacating *inter partes* reexam entered on November 8,

2007 which vacated the decision granting *inter partes* reexamination order mailed on November

5, 2007 for incorrectly noting that the prior art references that were relied upon in the request

were not cited during the prosecution of the Schindler et al. patent.

2.      The instant patent issued December 5, 2006 based on US Patent Application Ser. No.

11/165,280, filed June 2, 2005 as a division of application No. 09/147,970 field as application

No. PCT/DE97/02363 on October 7, 1997.

### *References Cited in the Request*

3.      The Request identifies the following printed publications as providing teachings relevant

to the claims of the '902 Schindler patent

        Farese U.S. Patent 4,996,685

        Focsaneanu U.S. Patent 5,610,910

        Jonas U.S. Patent 6,137,792

        "Lucent Technologies announces Internet telephony servers to put voice, fax and voice
        mail on the Internet," *Lucent Technologies,*  September 17, 1996, (hereinafter Lucent
        Press Release).

        Matsukawa U.S. Patent 5,598,411

Application/Control Number: 95/001,001                                 Page 3
Art Unit: 3992

      Yoshida U.S. Patent 5,347,516

      Arrango US Patent 5,732,078

### *Detailed Explanation of How the Cited Prior Art is Applied to Every Claim for Which Reexamination is Requested.*

Issue 1:    Focsaneanu US Patent 5,610,910 is asserted as rendering claims 36,37,54-58, 61,
            64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87,90-92,95,98,100,102,104,118-120,122-
            125 anticipated.

Issue 2:    Jonas US Patent 6,137,792 is asserted as rendering claims 36,37,54,55,60, 61, 64,
            66, 68, 69, 71, 75, 77, 79, 82, 84, 87,90,92,95,98,100,102,118,120-124
            anticipated.

Issue 3:    Farese US Patent 4,996,685 is asserted as rendering claims 36,41,54,55,60, 62,
            64, 68, 69, 71, 75, 77, 79, 82 anticipated.

Issue 4:    Arrango US Patent 5,732,078 is asserted as rendering claims
            36,37,84,90,92,98,118,120-124 anticipated.

Issue 5:    Matsukawa US Patent 5,598,411 is asserted as rendering claims 36, 68, 69, 71,
            75, 77, 79, 82 anticipated.

Issue 6:    Yoshida US Patent 5,347,516 is asserted as rendering claims
            36,37,54,55,56,58,62, 64, 68, 69, 71, 75, 77, 79, 82, 84, 87,90,92,95,98
            anticipated.

Issue 7:    Focsaneanu in view of Jonas and further in view of Lucent Press Release
            (hereinafter Lucent) is asserted as rendering claims 36, 37, 54-58, 60-62, 64, 66,
            68, 69, 71, 75, 77, 79, 82, 84, 87, 90-92, 95, 98, 100, 102, 104 and 118-125
            obvious.

Issue 8:    Focsaneanu in view of Farese and further in view of Lucent Press Release
            (hereinafter Lucent) is asserted as rendering claims 36, 37, 41, 54-58, 60-62, 64,
            66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 92, 95, 98, 100, 118 and 123 obvious.

Issue 9:    Focsaneanu in view of Arango and further in view of Lucent Press Release
            (hereinafter Lucent) is asserted as rendering claims 36, 37, 66-69, 75, 77, 82, 84,
            90-92, 98, 100, 102 and 118-125 obvious.

Issue 10:   Focsaneanu in view of Matsukawa and further in view of Lucent Press Release
            (hereinafter Lucent) is asserted as rendering claims 36, 68, 69, 71, 75, 77, 79, 82,
            84, 87, 90, 92, 95, 98, 100, 118 and 123 obvious.

Issue 11:   Focsaneanu in view of Yoshida and further in view of Lucent Press Release
            (hereinafter Lucent) is asserted as rendering claims 36, 37, 54-58, 64, 68, 69, 75,
            71, 77, 79, 82, 84, 87, 90-92, 95, 98, 100, 118 and 123 obvious.

## *Prosecution History*

Application 11/165,280 which became the '902 patent was filed on June 22, 2005. The

Examiner issued a non-final rejection on September 16, 2005 and an Interview was held on

February 9, 2006 in which the applicant suggested to incorporate the limitation regarding the "3

period for PSTN fallback" into the claims. The applicant amended the claims on March 20, 2006

and filed a Terminal Disclaimer.

The Examiner issued a Notice of Allowance which stated that the prior art does not

disclose "a change over from packet switching, used for trace routing, to line switching when the

digitized speech is sent over an Internet connection, also, a control signal that is produced by a

network management system instead of originating from the user of an end terminal, and a

control device that directs the data packets from the multiple origin end terminals to either the

packet switching device or to the line switching device." A second Notice of Allowance was

mailed on June 14, 2006 that considered an IDS statement. No reasons for allowance were

provided. The Applicant filed an RCE on August 2, 2006 for an apparent consideration of an

IDS. The Examiner held an interview on October 3, 2006 discussing two newly cited prior art

references. The Applicant agreed to cancel claims 105-117 in view of the references. The

Examiner also issued a notice of allowance on October 10, 2006 that repeated the initial reasons

for allowance as stated above.

### *The Schindler et al Patent*

A method for transferring data selectively by line switching or by packet switching from
a first switch to a second switch, the first switch being part of or having access to a line-
switching network and a packet switching network, comprising:

a) packetizing the data into data packets in the first switch if the data does not yet exist as
data packets;

b) transferring the data packets from the first switch through the packet-switching
network to the second switch;

c) checking whether a control signal exists for changing-over from the packet-switching
data transfer of the data packets through the packet switching network to a line-switching
connection to the second switch, wherein the control signal is produced by a network
management system;

d) establishing the line-switching connection through the line-switching network to the
second switch in response to said control signal, if the line-switching connection is not yet
present; and

e) changing-over from the packet-switching data transfer of the data packets through the
packet switching network to a line-switching data transfer in response to said control signal and
transferring data over the line switching connection to the second switch.

### *Discussion of the Issues that Raise a SNQ*

#### *Focsaneanu*

*Issues 1 and 7-11:*    The Requestor alleges that several substantial new questions of
Patentability (SNQ) are raised by Focsaneanu.

The Focsaneanu patent was cited during prosecution of the Schindler et al. patent, but was

not applied during prosecution in a rejection of a claim. Thus a substantial new question of

patentability would be based on patents and/or printed publications already cited/considered in

an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public

Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the

reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

> "The existence of a substantial new question of patentability is not precluded by the fact that
> a patent or printed publication was previously cited by or to the Office or considered by the
> Office."

For any reexamination ordered on or after November 2, 2002, the effective date of the

statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily

preclude the existence of a substantial new question of patentability (SNQ) that is based

exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance

shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here, Focsaneanu was cited during prosecution of the Schindler patent, thus Focsaneanu

is being presented in a new light, or in a different way, as compared with its use in the earlier

concluded examination.

A discussion of the specifics now follows:

As stated in the request, Focsaneanu '910 teaches the method of transferring data

selectively by line switching or by packet switching (figs. 7 and 8; col. 7, lines 10-15 and col. 9

lines 14-22) from a first switch (Access Module figs. 7, 8 and 13) to a second switch ("Local

Switch" of PSTN Network 212 or 216 -fig. 7; or far "local switch" figs. 4, 5 and 6), the first

switch (Access Module) being part of or having access to a line-switching network (PSTN

Network Figs. 7, 8 and 13) and a packet switching network (Data Network - figs. 7, 8 and 13).

Focsaneanu '910 teaches checking whether a control signal (from Controller 252 to

Processor 246 in response to "identifying circuit" of transceiver 238 -fig. 7) exists for changing-

over from the packet-switching data transfer of the data packets through the packet switching

network (Data Network Figs. 7, 8 and 13) to a line-switching connection to the second switch

("Local Switch" of PSTN Network 212 or 216 -fig. 7; "Local Switch" of PSTN Network 360 -

fig. 10; or far "local switch" -figs. 4, 5 and 6), wherein the control signal is produced by a

network management system.

Focsaneanu '910 teaches (the processor enables) changing-over from the packet-

switching data transfer of the data packets through the packet switching network (Data Network -

figs. 7, 8 and 13) to a line-switching (POTS) data transfer in response to said control signal (from

Controller 252 to Processor 246 in response to "identifying circuit" of transceiver 238 -fig. 7)

and transferring data over the line switching connection (PSTN Network -figs. 7, 8 and 13) to the

second switch (Local Switch" of PSTN Network 212 or 216 Fig. 7; "Local Switch" of PSTN

Network 360 Fig. 10; or far "local switch" -figs. 4, 5 and 6).

Focsaneanu disclose that the "identifying circuit" (which is in the access module (which

is part of the "network management system") detects and identifies a service request as a POTS

service or data service request, (col. 8, lines 2-6). When a customer's service request is first

detected, it is determined whether the request is for data services or a POTS service, and then the

type of data service is determined by consulting the database, (col. 8, lines 12-24). Focsaneanu

states that processor 246 performs a selection and enablement of either POTS service or data

service in response to the "identifying circuit" (i.e. in response to a control signal from the

Access Module (network management system).

The teaching of at least checking whether a control signal exists for changing-over from

the packet-switching data transfer of the data packets through the packet switching network to a

line-switching connection wherein the control signal is produced by a network management

system was not present in the prosecution of the application which became the '902 patent and

thus it is agreed that Focsaneanu raises a SNQ over at least claims 36, 37, 41, 54-58, 60-

62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant '902

Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the instant claims

under reexamination are patentable. Accordingly, the Focsaneanu reference raises a SNQ as to at

least claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104

and 118-125 of the instant '902 Patent.

### *Jonas*

*Issue 2:*          The Requestor alleges that a substantial new question of Patentability
                    (SNQ) is raised by Jonas.

The Jonas patent was cited during prosecution of the Schindler et al. patent, but was not

applied during prosecution in a rejection of a claim. Thus a substantial new question of

patentability would be based on patents and/or printed publications already cited/considered in

an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public

Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the

reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

"The existence of a substantial new question of patentability is not precluded by the fact that
a patent or printed publication was previously cited by or to the Office or considered by the
Office."

For any reexamination ordered on or after November 2, 2002, the effective date of the

statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily

preclude the existence of a substantial new question of patentability (SNQ) that is based

exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance

shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here Jonas was not applied by the Examiner during prosecution of the Schindler patent,

thus Jonas is being presented in a new light, or in a different way, as compared with its use in the

earlier concluded examination.

Jonas '792 discloses transferring data selectively by line switching (Bypass Network 30)

or by packet switching (Internet 40) from a first switch (Router 20) to a second switch (Router

21), the first switch being part of or having access to a line-switching network (Bypass Network

30) and a packet switching network (Internet 40).

Jonas '792 discloses checking for a change over signal to change from the packet

switching network (Internet 40) to a line-switching connection (Bypass Network 30) to the

second switch (Router 21) by a network management system. The '792 patent teaches watching

internet traffic to determine if conditions are met to change over from Internet 50 to Bypass

Network 30. "Certain applications, may wish to dynamically take advantage of both the inherent

cost benefit of using the packet-switched Internet and the minimal delay time of circuit-switched

telephone networks. This is accomplished by having the system monitor the transmission delay

between the source router 20 and destination router 21. If this delay rises above a threshold value

the source router 20 will establish a connection over the bypass network 30. The source router 20

may detect the transmission delay to the destination router 21 using a variety of measures known

Application/Control Number: 95/001,001                                    Page 10
Art Unit: 3992

to those skilled in the art, including topological delay time for the transmission...., (col. 5, lines 53-64). The threshold traffic will trigger a signal for the change over.

Jonas '792 discloses "The source computer designates data packets to be transmitted over the bypass circuit- switched telephone network. These data packets are detected by the source router which establishes a connection to the destination router via the bypass circuit-switched telephone network." (abstract, col. 3, lines 44-48; col. 4, line 67-col. 5, line 3' col. 5, lines 58-60).

Jonas '792 discloses causing said first router to dial a telephone number associated with said second router while maintaining the packet-switched connection" (col. 6, lines 47-51; col. 8, lines 19-23).

Jonas '792 discloses "The sending router computer recognizes the request to transmit over the bypass network, establishes a connection over the circuit-switched telephone network, and then transmits the packet over the bypass circuit-switched telephone network.... This is accomplished by having the system monitor the transmission delay between the source router 20 and destination router 21. If this delay rises above a threshold value the source router 20 will establish a connection over the bypass network 30." (col. 3, lines 44-48; col. 5, lines 56-60).

The Jonas '792 patent, therefore teaches the use of a threshold value to trigger a signal to switch over to the bypass network and transmit over this line-switched network.

The teaching of at least checking whether a control signal exists for changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching connection wherein the control signal is produced by a network management system was not present in the prosecution of the application which became the '902 patent and

thus it is agreed that Jonas raises a SNQ over at least claims 36, 37, 41, 54-58, 60-62, 64, 66, 68, 69, 71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-124 of the instant '902 Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the instant claims under reexamination are patentable. Accordingly, the Jonas reference raises a SNQ as to at least claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92, 95, 98, 100,102,104 and 118-125 of the instant '902 Patent.

### *Farese*

*Issue 3:*          The Requestor alleges that a substantial new question of Patentability (SNQ) is raised by Farese.

The Farese patent was cited during prosecution of the Schindler et al. patent, but was not applied during prosecution in a rejection of a claim. Thus a substantial new question of patentability would be based on patents and/or printed publications already cited/considered in an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

"The existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office or considered by the Office."

For any reexamination ordered on or after November 2, 2002, the effective date of the statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily preclude the existence of a substantial new question of patentability (SNQ) that is based

exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance
shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here Farese was not applied by the Examiner during prosecution of the Schindler patent,
thus Farese is being presented in a new light, or in a different way, as compared with its use in
the earlier concluded examination.

Farese '685 teaches "A technique is disclosed for use in conjunction with an ISDN
communications system for permitting a host computer, that is executing a host session with a
user and is connected through the system, to dynamically change an ISDN access path, that
connects the user to the host computer and carries the host session therebetween, between a
packet switched connection and a circuit switched connection during the occurrence of the
session in order to provide the particular connection that is most suited to the communication
requirements of a task currently being executed during the session by the host computer. Any
such dynamic change of the ISDN access path is invoked by the host computer, does not disrupt
the host session and is substantially transparent to the user." Abstract.

Farese '685 teaches "These and other similar deficiencies associated with ISDN
communication systems known in the art are advantageously eliminated in accordance with
the present invention by: dynamically changing the ISDN access path that is established through
an ISDN communication system, e.g. an ISDN switch, between a user terminal and a host
computer from a first connection, such as a B channel circuit switched connection, to a second
connection, such as a D channel packet switched connection or vice versa during an ongoing host
session carried over that access path in order to provide the particular connection, either B
channel circuit switched or D channel packet switched, that is most suited to the current

communication needs of the session. As such, the ISDN connection provided over the access

path, rather than being static as is taught in the art, dynamically changes in response to

commands (suitable control messages) that are issued by the host computer thereby effectively

matching an available communication channel to the current host task being executed during the

session. This dynamic matching of network resources to host requirements advantageously

minimizes wasted transmission bandwidth and conserves network resources." Col. 6:58-7:13.

Farese '685 teaches "System 5 can accommodate a multitude of users to dynamically

change the ISDN channel (between circuit and packet switched) used by each user in accordance

with communication requirements of each corresponding host session thereby dynamically

matching the available communication bandwidth to the host task presently being executed for

that user." Col. 13:3-13:9. "In any event, receipt of the Q.931 Setup message, if it originates

with the Broker PC, indicates that the Broker PC and there through the ISDN switch have been

instructed by the host computer to change the ISDN connection between the User PC and the

Broker PC from D channel packet switched to B channel circuit switched and that the User PC

should appropriately switch its ISDN connection to the switch. Specifically, once the Q.931 Call

Setup message has been received by the User PC, the User PC will verify whether this message

originated with the Broker PC, i.e. Broker PC 50 shown in FIG. 1, by examining the contents of

a Calling Party Identification field that forms part of this message. If this message did not

originate with the Broker PC, then, as shown by line 223 in FIGS. 2A and 2B, an error condition

has occurred inasmuch as the User PC has received a Q.931 message from a Broker PC that is

not presently associated with the User PC. As such, the User PC will transmit a Q.931 Call

Disconnect message over the D channel to the ISDN switch to instruct the switch to tear down

the B Channel circuit switched connection that it has just erroneously established to the User PC.

Once this Disconnect message is transmitted, the state of the User PC transitions back into D

Channel Steady State as indicated by line 223. If, however, the originator of the Q.931 Call

Setup message was the proper Broker PC, i.e. Broker PC 50 shown in FIG. 1, then, as shown in

FIGS. 2A and 2B, the User PC will transition along line 227 to B Channel Establishment state

230 to suitably change its ISDN connection to the switch.

The teaching of at least checking whether a control signal exists for changing-over from

the packet-switching data transfer of the data packets through the packet switching network to a

line-switching connection wherein the control signal is produced by a network management

system was not present in the prosecution of the application which became the '902 patent and

thus it is agreed that Farese raises a SNQ over at least claims 36, 37, 41, 54-58, 60-

62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant '902

Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the instant claims

under reexamination are patentable. Accordingly, the Farese reference raises a SNQ as to at least

claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and

118-125 of the instant '902 Patent.

### *Arrango*

*Issue 4:*       The Requestor alleges that a substantial new question of Patentability
                 (SNQ) is raised by Arrango.

The Arrango patent was cited during prosecution of the Schindler et al. patent, but was not

applied during prosecution in a rejection of a claim. Thus a substantial new question of

patentability would be based on patents and/or printed publications already cited/considered in

an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public

Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the

reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

"The existence of a substantial new question of patentability is not precluded by the fact that
a patent or printed publication was previously cited by or to the Office or considered by the
Office."

For any reexamination ordered on or after November 2, 2002, the effective date of the

statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily

preclude the existence of a substantial new question of patentability (SNQ) that is based

exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance

shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here Arrango was not applied by the Examiner during prosecution of the Schindler

patent, thus Arrango is being presented in a new light, or in a different way, as compared with its

use in the earlier concluded examination.

Arango '078 teaches that "the present invention is directed to communication networks,

such as the Internet, which include multiple host nodes, or hosts, and multiple router nodes, or

routers, (col. 1, lines 7-9)." Arango describes, among other things, changing over between a

packet switching of data over a WAN such as the Internet and the line-switching of data by

means of a special bypass connection established on a "guaranteed bandwidth network," such as the PSTN or the line switched ISDN, (abstract; fig. 6).

Arango also describes the ability to switch some data from a connection between end terminals on a packet switched WAN and other data from that connection on the guaranteed bandwidth network. "...selective routing of some packets from a source node to a destination node via the wide area network and other packets from the same source node to the same destination node via the guaranteed bandwidth network", (col. 8, lines 12-21). Thus, Arango describes a method and structure by which: "[t]he access point, of a host that desires to establish a time-sensitive communication with a second host, communicates with a second access point of the second host via the Internet backbone. The two access points then set up a continuous bandwidth channel via a supplementary guaranteed bandwidth network which bypasses the Internet backbone, (col. 8, line 59-col. 9, line 3).

Arango discloses network management features of the access point 220 in Figure 8, and describes how those features signal a change over from packet switching of some data to line switching. "FIG. 8 shows the relationship of various procedures executed in the OGB server 228,248 (FIG. 6) or 328 (FIG. 7) and the user interface (Web browser) in the hosts 210, 250 (FIG. 6) and routing tables in the access servers 222, 242 (FIG. 6) and guaranteed bandwidth routers 226, 246 (FIG. 7). As shown, the OGB server executes a route controller agent procedure 420, a route switch agent procedure 410, an access point manager procedure 430 and one or more interface handler procedures 440, (col. 16, lines 14-22)." "The OGB server 228 then instructs the guaranteed bandwidth router 226 to set up a communication channel of a specified, continuous bandwidth (as agreed during the negotiations above) to the guaranteed bandwidth

router 246 using the guaranteed bandwidth address obtained from the OGB server 248. The OGB

server 228 also modifies the routing table of the guaranteed bandwidth router 226 so as to route

packets originating from the host 210 and destined to the host 250 to the router 246 and to

transmit such packets on the channel thus opened. The OGB server 228 also modifies the router

226 routing table so as to route to the access server 222 packets received on the same channel

from the host 246 originating at the host 250 and destined to the host 210." Col. 12:53-65

Arango teaches "another aspect of the invention pertains to selective routing of some

packets from a source node to a destination node via the wide area network and other packets

from the same source node to the same destination node via the guaranteed bandwidth network.

This aspect of the invention is applicable to both embodiments described. Furthermore, this

aspect of the invention can apply to a network where the subnetworks, themselves, which contain

the source node and the destination node are connected to the guaranteed bandwidth network,

(col. 7, lines 12-16)". "Thus, the access points contain a connection to the guaranteed bandwidth

network and a connection to the Internet backbone (best effort wide area network). The access

points perform the negotiation for setting up the guaranteed, continuous bandwidth

communication by exchanging packets via the Internet backbone. The access point performs the

IP-to- guaranteed bandwidth network address translation. The access points also establish the

guaranteed continuous bandwidth channel on the guaranteed bandwidth network. Furthermore,

the access points perform the re- routing of selected guaranteed bandwidth packets, so that they

are transmitted via the guaranteed bandwidth channel, and route packets received from the

guaranteed bandwidth channel to the appropriate host connected thereto, (col. 13, lines 55-col.

14, line 2)."

Application/Control Number: 95/001,001                                          Page 18
Art Unit: 3992

The teaching of at least checking whether a control signal exists for changing-over from

the packet-switching data transfer of the data packets through the packet switching network to a

line-switching connection wherein the control signal is produced by a network management

system was not present in the prosecution of the application which became the '902 patent and

thus it is agreed that Arrango raises a SNQ over at least claims 36, 37, 41, 54-58, 60-62, 64, 66,

68, 69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant '902 Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the instant claims

under reexamination are patentable. Accordingly, the Arrango reference raises a SNQ as to at

least claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92, 95, 98,

100,102,104 and 118-125 of the instant '902 Patent.

### *Matsukawa*

*Issue 5:*            The Requestor alleges that a substantial new question of Patentability
                      (SNQ) is raised by Matsukawa.

The Matsukawa patent was cited during prosecution of the Schindler et al. patent, but was

not applied during prosecution in a rejection of a claim. Thus a substantial new question of

patentability would be based on patents and/or printed publications already cited/considered in

an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public

Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the

reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

"The existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office or considered by the Office."

For any reexamination ordered on or after November 2, 2002, the effective date of the statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily preclude the existence of a substantial new question of patentability (SNQ) that is based exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here Matsukawa was not applied by the Examiner during prosecution of the Schindler patent, thus Matsukawa is being presented in a new light, or in a different way, as compared with its use in the earlier concluded examination.

Matsukawa '411 teaches a method for transferring data selectively by line switching or by packet switching (col. 2, lines 45-47) from a first switch (ISDN Terminal Adapter 2) to a second switch (ISDN Protocol Adapter 2'). "Protocol Switching Unit 22 selects between an ISDN line switching network through Speed Matching Unit 23 and an ISDN packet switching network through Packet Processing Unit 24. Thus, the first switch has access to a line switching network and a packet switching network.

Matsukawa teaches that the protocol processing switching unit 22 within the first switch (ISDN Terminal Adapter 2) checks whether a control signal (output of Timer T2) exists. If it exists the system changes over from a packet switching network to a line-switching network (fig. 6). "Thereafter, the timer 27 generates a switching request signal and transmits it to the protocol processing switching unit 22 to select the speed matching unit 24 instead of the packet

processing unit 23, (col. 5, lines 39-42; fig. 6)". <u>Timer T2 produces the control signal</u>
<u>automatically in the network management system</u> and not by the user.

Matsukawa teaches that in response to the control signal (output of Timer T2), the system

switches over from the packet switching data transfer (Packet Protocol Unit 24) to line switching

data transfer (Speed Matching Unit 23). ("Thereafter, data communication by circuit switching is

established, (col. 6, lines 9-10; fig. 6)".

The teaching of at least checking whether a control signal exists for changing-over from

the packet-switching data transfer of the data packets through the packet switching network to a

line-switching connection wherein the control signal is produced by a network management

system was not present in the prosecution of the application which became the '902 patent and

thus it is agreed that Matsukawa raises a SNQ over at least claims 36, 37, 41, 54-58, 60-62, 64,

66, 68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant '902 Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the instant claims

under reexamination are patentable. Accordingly, the Matsukawa reference raises a SNQ as to at

least claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92, 95, 98,

100,102,104 and 118-125 of the instant '902 Patent.

### *Yoshida*

*Issue 6:*          The Requestor alleges that a substantial new question of Patentability
                    (SNQ) are raised by Yoshida.

The Yoshida patent was cited during prosecution of the Schindler et al. patent, but was not applied during prosecution in a rejection of a claim. Thus a substantial new question of patentability would be based on patents and/or printed publications already cited/considered in an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

"The existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office or considered by the Office."

For any reexamination ordered on or after November 2, 2002, the effective date of the statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily preclude the existence of a substantial new question of patentability (SNQ) that is based exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here Yoshida was not applied by the Examiner during prosecution of the Schindler patent, thus Yoshida is being presented in a new light, or in a different way, as compared with its use in the earlier concluded examination.

Yoshida '516 discloses an ISDN Access System in fig. 1 for selectively routing a telephone call from a first end terminal to a second end terminal. Yoshida discloses it is predetermined that B1 and B2 channels correspond to packet switch and the line switch, respectively. Therefore, when the channel indicator is representative of the B1 channel in a single call control, the switch indicator is representative of the packet switch in the call control.

On the other hand, when the channel indicator is representative of the B2 channel in a single call

control, the switch indicator is representative of the line switch in the call control, (col. 5, lines

45-52).

Yoshida also discloses "when the call connection is performed at time $t_2$ the control

channel processor 27 produces the connection acknowledge signal (step S4, FIG. 5). In response

to the connection acknowledge signal, the controller 28 produces the switching signal so that the

switching circuit 20 switches the input port from the first output port 22 to the second output port

23 at time $t_3$ (step S5, FIG. 5). As a result, the packet data signal is delivered as the second

switched signal to the interface circuit 30 and then transmitted in the B2 channel to the line

switch in the ISDN switch 12, (col. 6, lines 22-32; figs. 4 and 5).

The flow chart in Fig. 5 at step 3 (S3) shows "PERFORM CALL CONNECTION FOR

B2 CHANNEL" and thereafter at step 4 (S4) checks to insure the connection was made "CALL

CONNECTION IS PERFORMED?" As indicated in the text above, the B2 channel is the line

switched network connection.


The teaching of at least checking whether a control signal exists for changing-over from

the packet-switching data transfer of the data packets through the packet switching network to a

line-switching connection wherein the control signal is produced by a network management

system was not present in the prosecution of the application which became the '902 patent and

thus it is agreed that Yoshida raises a SNQ over at least claims 36, 37, 41, 54-58, 60-62, 64, 66,

68, 69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant '902 Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the instant claims under reexamination are patentable. Accordingly, the Yoshida reference raises a SNQ as to at least claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92, 95, 98, 100,102,104 and 118-125 of the instant '902 Patent.

### *Scope of Reexamination*

4.      Since requester did not request reexamination of claims 1-35,38-40,42-53, 59, 63, 65, 67, 70,72-74,76,78,80-81,83,85,86,88,89,93,94,96,97,99,101 and 103 and did not assert the existence of a substantial new question of patentability (SNQP) for such claims  (see 35 U.S.C. § 311(b)(2); see also 37 CFR 1.915b and 1.923), such claims will not be reexamined. This matter was squarely addressed in *Sony Computer Entertainment America Inc., et al. v. Jon W. Dudas*, Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy, 2006 WL 1472462. (Not Reported in F.Supp.2d.) The District Court upheld the Office's discretion to not reexamine claims in an *inter partes* reexamination proceeding other than those claims for which reexamination had specifically been requested. The Court stated:

> To be sure, a party may seek, and the PTO may grant, *inter partes* review of each and every claim of a patent. Moreover, while the PTO in its discretion may review claims for which *inter partes* review was not requested, nothing in the statute compels it to do so. To ensure that the PTO considers a claim for *inter partes* review, § 311(b)(2) requires that the party seeking reexamination demonstrate why the PTO should reexamine each and every claim for which it seeks review. Here, it is undisputed that Sony did not seek review of every claim under the '213 and '333 patents. Accordingly, Sony cannot now claim that the PTO wrongly failed to reexamine claims for which Sony never requested review, and its argument that AIPA compels a contrary result is unpersuasive.

(Slip copy at page 9.)

Application/Control Number: 95/001,001                                    Page 24
Art Unit: 3992

The *Sony* decision's reasoning and statutory interpretation apply analogously to *ex parte* reexamination, as the same relevant statutory language applies to both *inter partes* and *ex parte* reexamination. 35 U.S.C. § 302 provides that the *ex parte* reexamination "request must set forth the pertinency and manner of applying cited prior art to every claim for which reexamination is requested" (emphasis added), and 35 U.S.C. § 303 provides that "the Director will determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request..." (Emphasis added). These provisions are analogous to the language of 35 U.S.C. § 311(b)(2) and 35 U.S.C. § 312 applied and construed in *Sony*, and would be construed in the same manner. As the Director can decline to reexamine non-requested claims in an *inter partes* reexamination proceeding, the Director can likewise do so in *ex parte* reexamination proceeding. See *Notice of Clarification of Office Policy To Exercise Discretion in Reexamining Fewer Than All the Patent Claims* (signed Oct. 5, 2006) 1311 OG 197 (Oct. 31, 2006). See also MPEP § 2240, Rev. 5, Aug. 2006.

Therefore, claims 1-35,38-40,42-53, 59, 63, 65, 67, 70,72-74,76,78,80-81, 83, 85, 86, 88, 89, 93,94,96,97,99,101 and 103 will not be reexamined in this *inter partes reexamination* proceeding.

5.      For the reasons set forth *supra*, the request raises an SNQ as to claims 36,37,41,54-58,60-62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant 7,145,902 Patent to Schindler et al. The request for *inter partes* reexamination is Granted. Claims 36,37,41,54-58,60-62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of U.S. Patent 7,145,902 will be reexamined.

Application/Control Number: 95/001,001                                      Page 25

Art Unit: 3992

### *Conclusion*

### NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that:

The patent owner's correspondence address for all communications in an *ex parte* reexamination or an *inter partes* reexamination is designated as the correspondence address of the patent.

> *Revisions and Technical Corrections Affecting Requirements for Ex Parte and Inter Partes Reexamination*, 72 FR 18892 (April 16, 2007)(Final Rule)

**The correspondence address for any pending reexamination proceeding not having the same correspondence address as that of the patent is, by way of this revision to 37 CFR 1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any reexamination proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct communications accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for the present proceeding is different from the correspondence address of the patent, it is strongly encouraged that the patent owner affirmatively file a Notification of Change of Correspondence Address in the reexamination proceeding and/or the patent (depending on which address patent owner desires), to conform the address of the proceeding with that of the patent and to clarify the record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

| | |
|---|---|
| Reexamination and Amendment Practice | (571) 272-7703 |
| Central Reexam Unit (CRU) | (571) 272-7705 |
| Reexamination Facsimile Transmission No. | (571) 273-9900 |

6.      Extensions of time under 37 CFR 1.136(a) will not be permitted in *inter partes*

reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant"

and not to the patent owner in a reexamination proceeding. Additionally, 35 U.S.C. 314(c)

requires that inter partes reexamination proceedings "will be conducted with special dispatch"

Application/Control Number: 95/001,001                                    Page 26
Art Unit: 3992

(37 CFR 1.937). Patent owner extensions of time in inter partes reexamination proceedings are

provided for in 37 CFR 1.956. Extensions of time are not available for third party requester

comments, because a comment period of 30 days from service of patent owner's response is set

by statute. 35 U.S.C. 314(b)(3).

7.      The Patent Owner is reminded of the continuing responsibility under 37 CFR 1.985(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving the

US Patent 7,145,902 throughout the course of this reexamination proceeding. The Third Party

Requester is also reminded of the ability to similarly apprise the Office of any such activity or

proceeding through the course of this reexamination proceeding. See MPEP § 2686 and

2686.04.

8.      All correspondence relating to this *inter partes* reexamination proceeding should be

directed as follows:

By **U.S. Postal Service Mail** to:

        Mail Stop *Inter Partes* Reexam
        ATTN: Central Reexamination Unit
        Commissioner for Patents
        P.O. Box 1450
        Alexandria, VA  22313-1450

By FAX to:    (571) 273-9900
              Central Reexamination Unit

By hand to:   Customer Service Window
              Randolph Building
              401 Dulany St.
              Alexandria, VA  22314

Application/Control Number: 95/001,001                                    Page 27
Art Unit: 3992

9.    Any inquiry concerning this communication or earlier communications from the

examiner, or as to the status of this proceeding, should be directed to the Central Reexamination

Unit at telephone number (571) 272-7705.

Ovidio Escalante
_____
Ovidio Escalante
Primary Examiner
Central Reexamination Unit 3992

Conferee:                                    Conferee:

Application/Control Number: 95/001,001                                                    Page 2
Art Unit: 3992

### Detailed Action

1.      This Office action address claims  36,37,41,54-58,60-62, 64, 66, 68, 69, 71, 75, 77, 79,

82, 84,87,90-92,95,98,100,102,104 and 118-125 of United States Patent No. 7,145,902

(hereinafter Schindler), for which it has been determined in the Order Granting *Inter Partes*

reexamination, attached hereto, that a substantial new question of patentability was raised in the

request for *inter partes* reexamination, filed on September 7, 2007.

### Status of the Claims

2.      Original claims 36,37,41,54-58,60-62, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84,87,90-

92,95,98,100,102,104 and 118-125 are rejected.

### Rejections Proposed by the Requester

3.      The following 11 issues of rejections were proposed in the Request:

Issue 1:       Focsaneanu US Patent 5,610,910 is asserted as rendering claims 36,37,54-58, 61,
               64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87,90-92,95,98,100,102,104,118-120,122-
               125 anticipated.

Issue 2:       Jonas US Patent 6,137,792 is asserted as rendering claims 36,37,54,55,60, 61, 64,
               66, 68, 69, 71, 75, 77, 79, 82, 84, 87,90,92,95,98,100,102,118,120-124
               anticipated.

Issue 3:       Farese US Patent 4,996,685 is asserted as rendering claims 36,41,54,55,60, 62,
               64, 68, 69, 71, 75, 77, 79, 82 anticipated.

Issue 4:       Arango US Patent 5,732,078 is asserted as rendering claims
               36,37,84,90,92,98,118,120-124 anticipated.

Issue 5:       Matsukawa US Patent 5,598,411 is asserted as rendering claims 36, 68, 69, 71,
               75, 77, 79, 82 anticipated.

Application/Control Number: 95/001,001                                                    Page 3

Art Unit: 3992

Issue 6:       Yoshida US Patent 5,347,516 is asserted as rendering claims
               36,37,54,55,56,58,62, 64, 68, 69, 71, 75, 77, 79, 82, 84, 87,90,92,95,98
               anticipated.

Issue 7:       Focsaneanu in view of Jonas and further in view of Lucent Press Release
               (hereinafter Lucent) is asserted as rendering claims 36, 37, 54-58, 60-62, 64, 66,
               68, 69, 71, 75, 77, 79, 82, 84, 87, 90-92, 95, 98, 100, 102, 104 and 118-125
               obvious.

Issue 8:       Focsaneanu in view of Farese and further in view of Lucent Press Release
               (hereinafter Lucent) is asserted as rendering claims 36, 37, 41, 54-58, 60-62, 64,
               66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 92, 95, 98, 100, 118 and 123 obvious.

Issue 9:       Focsaneanu in view of Arango and further in view of Lucent Press Release
               (hereinafter Lucent) is asserted as rendering claims 36, 37, 66-69, 75, 77, 82, 84,
               90-92, 98, 100, 102 and 118-125 obvious.

Issue 10:      Focsaneanu in view of Matsukawa and further in view of Lucent Press Release
               (hereinafter Lucent) is asserted as rendering claims 36, 68, 69, 71, 75, 77, 79, 82,
               84, 87, 90, 92, 95, 98, 100, 118 and 123 obvious.

Issue 11:      Focsaneanu in view of Yoshida and further in view of Lucent Press Release
               (hereinafter Lucent) is asserted as rendering claims 36, 37, 54-58, 64, 68, 69, 75,
               71, 77, 79, 82, 84, 87, 90-92, 95, 98, 100, 118 and 123 obvious.

       The proposed rejections identified in issues 1-6 are adopted.

       The proposed rejections identified in issues 7-11 are not adopted.

### *Claim Rejections - 35 USC § 102*

4.     The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

       A person shall be entitled to a patent unless –

       (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on
       sale in this country, more than one year prior to the date of application for patent in the United States.

Application/Control Number: 95/001,001

Page 4

Art Unit: 3992

(e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

### *Issue 1*

### *Requester Proposed Rejection (Adopted)*

5.    Claims 36, 37,54-58, 61, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87,90-92, 95, 98, 100, 102,

104, 118-120,122-125 are rejected under 35 U.S.C. 102(e) as being anticipated by Focsaneanu

US Patent 5,610,910.

### *Regarding claim 36:*

**A method for transferring data selectively by line switching or by packet switching**

**from a first switch to a second switch, the first switch being part of or having access to a**

**line-switching network and a packet switching network, comprising:**

Focsaneanu discloses the method of transferring data selectively by line switching or by

packet switching (figs. 7 and 8; col. 7, lines 10-15; col. 9, lines 14-22) from a first switch

(Access Module - figs. 7, 8 and 13) to a second switch ("Local Switch" of PSTN Network 212 or

216 - fig. 7; or far "local switch" Figs. 4, 5 and 6), the first switch (Access Module) being part of

or having access to a line-switching network (PSTN Network Figs. 7, 8 and 13) and a packet

switching network (Data Network -figs. 7, 8 and 13), (col. 7, line 67-col. 8, line 14).

**a) packetizing the data into data packets in the first switch if the data does not yet**

**exist as data packets;**

Focsaneanu discloses the step of packetizing data into data packets in PAD 254 (Packet Assembly/Disassembly 254 Fig. 8; 550 Fig. 13) of the Access Module (first switch) if the data does not yet exist as data packets, (figs. 8 and 13), (col. 8, lines 20-26; col. 11, lines 12-15).

**b) transferring the data packets from the first switch through the packet-switching network to the second switch;**

Focsaneanu discloses the step of transferring data packets from the first switch (Access Module Figs. 7, 8 and 13) through the packet-switching network (Data Network Figs. 7, 8 and 13) to the second switch ("Local Switch" of PSTN Network 212 or 216 Fig. 7; "Local Switch" of PSTN Network 360 Fig. 10; or far "local switch" Figs. 4, 5 and 6). The Access Module causes the data packets to be transferred to the second switch through the packet-switching network (Data Network), (col. 9, lines 14-22,30-46,60-66).

**c) checking whether a control signal exists for changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching connection to the second switch, wherein the control signal is produced by a network management system;**

Focsaneanu discloses checking whether a control signal (from Controller 252 to Processor 246 in response to "identifying circuit" of transceiver 238 Fig. 7) exists for changing-over from the packet-switching data transfer of the data packets through the packet switching network (Data Network Figs. 7, 8 and 13) to a line-switching connection to the second switch ("Local Switch" of PSTN Network 212 or 216 Fig. 7; "Local Switch" of PSTN Network 360 Fig. 10; or far "local switch" Figs. 4, 5 and 6), wherein the control signal is produced by a network

management system, (col. 7, line 67-col. 8, line 14; col. 9, lines 31-33; col. 10, lines 7-9,20-22,

42-45; col. 11, lines 60-67).

**d) establishing the line-switching connection through the line-switching network to**

**the second switch in response to said control signal, if the line-switching connection is not**

**yet present; and**

Focsaneanu discloses establishing a line-switching connection through the line-switching

network (PSTN Network Figs. 7, 8 and 13) to the second switch ("Local Switch" of PSTN

Network 212 or 216 Fig. 7; "Local Switch" of PSTN Network 360 Fig. 10; or far "local

switch" Figs. 4, 5 and 6) in response to said control signal (from Controller 252 to Processor 246

in response to "identifying circuit" of transceiver 238 Fig. 7), if the line-switching connection is

not yet present, (col. 10, lines 7-16; col. 7, line 67-col. 8, line 14; col. 11, lines 7-15).

**e) changing-over from the packet-switching data transfer of the data packets**

**through the packet switching network to a line-switching data transfer in response to said**

**control signal and transferring data over the line switching connection to the second switch.**

Focsaneanu discloses (the processor enables) changing-over from the packet-switching

data transfer of the data packets through the packet switching network (Data Network Figs. 7, 8

and 13)to a line-switching (POTS) data transfer in response to said control signal (from

Controller 252 to Processor 246 in response to "identifying circuit" of transceiver 238 Fig. 7) and

transferring data over the line switching connection PSTN Network Figs. 7, 8 and 13) to the

second switch (Local Switch" of PSTN Network 212 or 216 Fig. 7; "Local Switch" of PSTN

Network 360 Fig. 10; or far "local switch" Figs. 4, 5 and 6), (col. 8, lines 12-15; col. 10, lines 20-

24; col. 11, lines 7-15; col. 14, lines 13-20).

Application/Control Number: 95/001,001                                    Page 7

Art Unit: 3992

***Regarding claims 37,54-58,61,64 and 66:***

The rejection was proposed by the third party requester in the request for reexamination,

and it <u>is adopted</u> for the reasons set forth in the request for reexamination at pages 166-167 (

claims 37/36 under Focsaneanu '910), page 169-170 (claims 54/36 under Focsaneanu '910),

page 172-173 (claims 55/54/36 under Focsaneanu '910), page 174 (claims 56/54/36 under

Focsaneanu '910), page 175-176 (claims 57/56/54/36 under Focsaneanu '910), page 176 (claims

58/56/54/36 under Focsaneanu '910), page 178-179 (claims 61/54/36 under Focsaneanu '910),

page 180-181 (claims 64/54/36 under Focsaneanu '910), page 183-184 (claims 66/36 under

Focsaneanu '910), which are hereby incorporated by reference.

***Regarding claim 68:***

**Switching apparatus for selectively routing a telephone call from a first end**

**terminal to a second end terminal, comprising:**

Focsaneanu discloses a switching apparatus (Access Module) for selectively routing a

telephone call from a first end terminal (CPE or data terminal, POTS phone, ISDN terminal or

fax) to a second end terminal (CPE), (figs. 4, 7; col. 7, line 67-col. 8, line 14).

**a device that provides access to a packet switching network through which data can**

**be sent for delivery to the second end terminal;**

Focsaneanu discloses an Access Module that provides access to a packet switching (Data)

network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu

discloses the Access Module has access to a line-switching network and a packet switching

network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment,

in which a plurality of different types of CPEs can access a plurality of different types of services

provided by service providers which may utilize different types of transport networks, e.g. PSTN
212 and data switched networks 214. The access module 208 connects service providers who
may have their own networks or may utilize any of a plurality of transport networks 212, 214 and
216 for services requested by CPEs, (col. 7, lines 10-15,36-39; figs. 4-6).

**means for transferring first data of the telephone call originated by the first
terminal through the packet switching network for delivery to the second end terminal;**

Focsaneanu discloses the function and corresponding structure (Access Module in Figs.
7, 8 and 13) for transferring data from the first terminal (CPE shown in Figs. 7, 8 and 13)
through the packet-switching network (Data Network Figs. 7, 8 and 13) to the second end
terminal (DTE at the far side of the Data Network Figs. 7, 8 and 13), (figs. 5 and 6, col. 6, line 3-
44).

**a device for establishing a connection to a line-switching network through which
data can be sent for delivery to the second end terminal;**

Focsaneanu discloses an Access Module that provides access to a line-switching (PSTN)
network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu
discloses the Access Module has access to a line-switching network and a packet switching
network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment,
in which a plurality of different types of CPEs can access a plurality of different types of services
provided by service providers which may utilize different types of transport networks, e.g. PSTN
212 and data switched networks 214. The access module 208 connects service
providers who may have their own networks or may utilize any of a plurality of transport
networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39).

Application/Control Number: 95/001,001                                    Page 9
Art Unit: 3992

**means for transferring second data of the telephone call originated by the first terminal over the connection through the line-switching network for delivery to the second end terminal;**

Focsaneanu discloses the function and corresponding structure (Access Module in Figs. 7, 8 and 13) for transferring second data of a telephone call from the first terminal (CPE shown in Figs. 7, 8 and 13) over the connection through the line-switching network (PSTN Figs. 7, 8 and 13) for delivery to the second end terminal (DTE at the far side of the PSTN network Figs. 7, 8 and 13), (figs. 4, 5 and 6; col. 5, line 47-col. 6, line 44).

**and means responsive to a control signal for changing-over from a packet-switching mode of transfer of the first data of the telephone call to a line-switching mode of transfer of the second data of the telephone call without interruption of a call-up procedure, wherein said control signal is produced by a network management system.**

Focsaneanu discloses the function and corresponding structure (the processor) for changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8 and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either POTS service [Line Switching] or data services [Packet Switching] in response to the identifying circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).


***Regarding claim 69:***

**Switching apparatus for selectively routing a telephone call from a first end**
**terminal to a second end terminal, comprising:**

Focsaneanu discloses a switching apparatus (Access Module) for selectively routing a

telephone call from a first end terminal (CPE or data terminal, POTS phone, ISDN terminal or

fax) to a second end terminal (CPE), (figs. 4, 7; col. 7, line 67-col. 8, line 14).

**means for establishing a connection to a packet switching network through which**
**data can be sent to the second end terminal;**

Focsaneanu discloses an Access Module that provides access to a packet switching (Data)

network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu

discloses the Access Module has access to a line-switching network and a packet switching

network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment,

in which a plurality of different types of CPEs can access a plurality of different types of services

provided by service providers which may utilize different types of transport networks, e.g. PSTN

212 and data switched networks 214. The access module 208 connects service providers who

may have their own networks or may utilize any of a plurality of transport networks 212, 214 and

216 for services requested by CPEs, (col. 7, lines 10-15,36-39; figs. 4-6).

**means for transferring first data of the telephone call originated by the first end terminal over the connection through the packet switching network for delivery to the second end terminal,**

Focsaneanu discloses the function and corresponding structure (Access Module in Figs. 7, 8 and 13) for transferring data from the first terminal (CPE shown in Figs. 7, 8 and 13) through the packet-switching network (Data Network Figs. 7, 8 and 13) to the second end terminal (DTE at the far side of the Data Network Figs. 7, 8 and 13), (figs. 5 and 6, col. 6, line 3-44).

**means for establishing a connection to a line-switching network through which data can be sent for delivery to the second end terminal;**

Focsaneanu discloses an Access Module that provides access to a line-switching (PSTN) network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu discloses the Access Module has access to a line-switching network and a packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment, in which a plurality of different types of CPEs can access a plurality of different types of services provided by service providers which may utilize different types of transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208 connects service providers who may have their own networks or may utilize any of a plurality of transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39).

**means for transferring second data of the telephone call originated by first end terminal over the connection through the line-switching network for delivery to the second end terminal; and**

Focsaneanu discloses the function and corresponding structure (Access Module in Figs. 7, 8 and 13) for transferring second data of a telephone call from the first terminal (CPE shown in Figs. 7, 8 and 13) over the connection through the line-switching network (PSTN Figs. 7, 8 and 13) for delivery to the second end terminal (DTE at the far side of the PSTN network Figs. 7, 8 and 13), (figs. 4, 5 and 6; col. 5, line 47-col. 6, line 44).

**means responsive to a control signal for changing-over from a packet-switching mode of transfer of the first data of the telephone call to a line-switching mode of transfer of the second data of the telephone call without interruption of a call set-up procedure.**

Focsaneanu discloses the function and corresponding structure (the processor) for changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8 and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either POTS service [Line Switching] or data services [Packet Switching] in response to the identifying circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic change over is first described: "... change of mode can be... a result of an automated non-intrusive observation of the channel..." where the access module monitors communications activity, (col. 10, lines 20-24).

### Regarding claims 71 and 75:

The rejection was proposed by the third party requester in the request for reexamination, and it is adopted for the reasons set forth in the request for reexamination at pages 258-260 (

Application/Control Number: 95/001,001                                    Page 13
Art Unit: 3992

claim 71 under Focsaneanu '910) and page 266 (claim 75 under Focsaneanu '910) which are hereby incorporated by reference.

### *Regarding claim 77:*

**A method of selectively routing a telephone call from a first end terminal to a second end terminal, comprising:**

Focsaneanu discloses an (Access Module) for selectively routing a telephone call from a first end terminal (CPE or data terminal, POTS phone, ISDN terminal or fax) to a second end terminal (CPE), (figs. 4, 7; col. 7, line 67-col. 8, line 14).

**establishing access of said first end terminal to a packet switching network through which data can be sent for delivery to the second end terminal;**

Focsaneanu discloses an Access Module that provides access to a packet switching (Data) network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu discloses the Access Module has access to a line-switching network and a packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment, in which a plurality of different types of CPEs can access a plurality of different types of services provided by service providers which may utilize different types of transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208 connects service providers who may have their own networks or may utilize any of a plurality of transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39; figs. 4-6).

**transferring first data of the telephone call originated by the first end terminal over the packet switching network for delivery to the second end terminal,**

Application/Control Number: 95/001,001                                          Page 14

Art Unit: 3992

Focsaneanu discloses the function and corresponding structure (Access Module in Figs.

7, 8 and 13) for transferring data from the first terminal (CPE shown in Figs. 7, 8 and 13)

through the packet-switching network (Data Network Figs. 7, 8 and 13) to the second end

terminal (DTE at the far side of the Data Network Figs. 7, 8 and 13), (figs. 5 and 6, col. 6, line 3-

44).

**responding to a control signal for changing-over from a packet-switching mode of**

**transfer of the first data of the telephone call to a line-switching mode of transfer of second**

**data of the telephone call originated by the first end terminal without interruption of a call**

**set-up procedure,**

Focsaneanu discloses the function and corresponding structure (the processor) for

changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of

the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8

and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either

POTS service [Line Switching] or data services [Packet Switching] in response to the identifying

circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a

call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic

change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

**by establishing a connection from said first end terminal to a line-switching network**

**through which data can be sent for delivery to the second end terminal and**

Focsaneanu discloses the function and corresponding structure (Access Module in Figs.

7, 8 and 13) for transferring second data of a telephone call from the first terminal (CPE shown

in Figs. 7, 8 and 13) over the connection through the line-switching network (PSTN Figs. 7, 8

and 13) for delivery to the second end terminal (DTE at the far side of the PSTN network Figs.

7, 8 and 13), (figs. 4, 5 and 6; col. 5, line 47-col. 6, line 44).

**establishing said line-switching mode of transfer of the second data of the telephone**

**call over the connection through the line-switching network for delivery to the second end**

**terminal.**

Focsaneanu discloses an Access Module that provides access to a line-switching (PSTN)

network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu

discloses the Access Module has access to a line-switching network and a packet switching

network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment,

in which a plurality of different types of CPEs can access a plurality of different types of services

provided by service providers which may utilize different types of transport networks, e.g. PSTN

212 and data switched networks 214. The access module 208 connects service

providers who may have their own networks or may utilize any of a plurality of transport

networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39).

### *Regarding claims 79 and 82:*

The rejection was proposed by the third party requester in the request for reexamination,

and it is adopted for the reasons set forth in the request for reexamination at page 291 (claim 79

under Focsaneanu '910) and page 294-295 (claim 82 under Focsaneanu '910) which are hereby

incorporated by reference.

Application/Control Number: 95/001,001                                    Page 16
Art Unit: 3992

*Regarding claim 84:*

**Switching apparatus for switching data packets from multiple origin end terminals, the data packets containing headers including information identifying respective origin and destination end terminals, the switching apparatus comprising:**

Focsaneanu discloses a switching apparatus (Access Module) for switching data packets from multiple origin end terminals (CPE or data terminal, POTS phone, ISDN terminal or fax), (figs. 7 and 15).

Focsaneanu discloses data networks and database services are accessed using a TCP/IP protocol, (col. 3, lines 6-7, 45-56; col. 7, lines 15-18). The Examiner notes that it is well known in the art that information sent over the Internet must follow the TCP/IP protocol which requires headers, and the information regarding the origin address and destination address is contained in the TCP/IP headers.

**a packet switching device for transferring data packets through a packet switching network through which data can be sent for delivery to destination end terminals;**

Focsaneanu discloses an Access Module for transferring data packets through a packet switching (Data) network through which data can be sent for delivery to destination end terminal s (CPEs). Focsaneanu discloses the Access Module has access to a line-switching network and a packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment, in which a plurality of different types of CPEs can access a plurality of different types of services provided by service providers which may utilize different types of transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208

Application/Control Number: 95/001,001                                                Page 17
Art Unit: 3992

connects service providers who may have their own networks or may utilize any of a plurality of

transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39;

figs. 4-6).

**a line switching device for establishing line connections through a line-switching**

**network through which data can be sent to the destination end terminals; and**

Focsaneanu discloses an Access Module that establishes line connections through a line-

switching (PSTN) network through which data can be sent to the destination end terminals

(CPEs). Focsaneanu discloses the Access Module has access to a line-switching network and a

packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the

actual environment, in which a plurality of different types of CPEs can access a plurality of

different types of services provided by service providers which may utilize different types of

transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208

connects service providers who may have their own networks or may utilize any of a plurality of

transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39).

**a control device connected to the packet switching device and the line switching**

**device for directing the data packets from the multiple origin end terminals to either the**

**packet switching device or to the line switching device,**

Focsaneanu  discloses a control device such as processor 246 and/or controller 252, which are

connected to the packet switching device and the line switching device for directing the data

packets from the multiple origin end terminals to either the packet switching device or to the line

switching device.

Focsaneanu discloses the function and corresponding structure (the processor) for
changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of
the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8
and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either
POTS service [Line Switching] or data services [Packet Switching] in response to the identifying
circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a
call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic
change over is first described: "... change of mode can be... a result of an automated non-
intrusive observation of the channel..." where the access module monitors communications
activity, (col. 10, lines 20-24).

**the control device being responsive to the data packet headers for controlling the
packet switching device and the line switching device for establishing and maintaining
respective communications connections for data transfer with real-time properties between
origin end terminals and destination end terminals,**

Focsaneanu discloses a control device such as processor 246 and/or controller 252, which
is responsive to the data packet headers for controlling the packet switching device and the line
switching device for establishing and maintaining respective communications connections for
data transfer with real-time properties between origin end terminals and destination end
terminals, (col. 7, lines 10-15,36-39).

**the control device also being responsive to a control signal for changing-over from
packet-switching transfer of first data of a communications connection to line-switching**

**transfer of second data of the communication connection without interruption of the communications connection.**

Focsaneanu discloses the function and corresponding structure (the processor) for changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8 and 13) of the second data of the telephone call without interruption of a call-up procedure. Focsaneanu discloses a processor 246 performs a selection and enablement of either POTS service [Line Switching] or data services [Packet Switching] in response to the identifying circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic change over is first described: "... change of mode can be... a result of an automated non-intrusive observation of the channel..." where the access module monitors communications activity, (col. 10, lines 20-24).

***Regarding claims 87,90 and 91:***

The rejection was proposed by the third party requester in the request for reexamination, and it is adopted for the reasons set forth in the request for reexamination at pages 317-318 (claim 87 under Focsaneanu '910), page 320 (claim 90 under Focsaneanu '910) and pages 322-323 (claim 91 under Focsaneanu '910) which are hereby incorporated by reference.

***Regarding claim 92:***

**A method of routing data packets from multiple origin end terminal in a data network, the data packets containing headers including information identifying respective origin and destination end terminals in the data network, the method comprising:**

Focsaneanu discloses a (Access Module) for switching data packets from multiple origin end terminals (CPE or data terminal, POTS phone, ISDN terminal or fax), (figs. 7 and 15).

Focsaneanu discloses data networks and database services are accessed using a TCP/IP protocol, (col. 3, lines 6-7, 45-56; col. 7, lines 15-18). The Examiner notes that it is well known in the art that information sent over the Internet must follow the TCP/IP protocol which requires headers, and the information regarding the origin address and destination address is contained in the TCP/IP headers.

**directing the data packets from the multiple end terminals to either a packet switching device or to a line switching device by inspecting the data packet headers, and in response to the data packet headers, establishing and maintaining respective communications connections for data transfer with real-time properties between origin end terminals and destination end terminals,**

Focsaneanu discloses a control device such as processor 246 and/or controller 252, which are connected to the packet switching device and the line switching device for directing the data packets from the multiple origin end terminals to either the packet switching device or to the line switching device.

Focsaneanu discloses the function and corresponding structure (the processor) for changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of

the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8

and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either

POTS service [Line Switching] or data services [Packet Switching] in response to the identifying

circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a

call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic

change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

Focsaneanu discloses processor 246 and/or controller 252, which is responsive to the data

packet headers for controlling the packet switching device and the line switching device for

establishing and maintaining respective communications connections for data transfer with real-

time properties between origin end terminals and destination end terminals, (col. 7, lines 10-

15,36-39).

**and responding to a control signal by changing-over from packet-switching transfer**

**of first data of at least one of the communications connections over a packet-switching**

**network to line-switching transfer of second data of said at least one of the communication**

**connections over a line-switching network without interruption of said at least one of the**

**communications connections.**

Focsaneanu discloses the function and corresponding structure (the processor) for

changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of

the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8

and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either POTS

service [Line Switching] or data services [Packet Switching] in response to the identifying

circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a

call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic

change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

***Regarding claims 95 and 98:***

The rejection was proposed by the third party requester in the request for reexamination,

and it <u>is adopted</u> for the reasons set forth in the request for reexamination at pages 338-339

(claim 95 under Focsaneanu '910) and  page 341 (claim 98 under Focsaneanu '910) which are

hereby incorporated by reference.


***Regarding claim 100:***

**Switching apparatus for switching Internet Protocol (IP) data packets from multiple**

**origin end terminals, the data packets containing headers including information identifying**

**respective origin and destination end terminals, the switching apparatus comprising:**

Focsaneanu discloses a switching apparatus (Access Module) for switching data packets

from multiple origin end terminals (CPE or data terminal, POTS phone, ISDN terminal or fax),

(figs. 7 and 15).

Focsaneanu discloses data networks and database services are accessed using a TCP/IP protocol, (col. 3, lines 6-7, 45-56; col. 7, lines 15-18). The Examiner notes that it is well known in the art that information sent over the Internet must follow the TCP/IP protocol which requires headers, and the information regarding the origin address and destination address is contained in the TCP/IP headers.

**an IP packet switching device for packet-switching transfer of data through the Internet for delivery to destination end terminals;**

Focsaneanu discloses an Access Module for transferring data packets through a packet switching (Data) network through which data can be sent for delivery to destination end terminal s (CPEs). Focsaneanu discloses the Access Module has access to a line-switching network and a packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment, in which a plurality of different types of CPEs can access a plurality of different types of services provided by service providers which may utilize different types of transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208 connects service providers who may have their own networks or may utilize any of a plurality of transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39; figs. 4-6).

**a line switching device for establishing line connections through a public telephone network through which data can be sent to the destination end terminals; and**

Focsaneanu discloses an Access Module that establishes line connections through a line-switching (PSTN) network through which data can be sent to the destination end terminals (CPEs). Focsaneanu discloses the Access Module has access to a line-switching network and a

packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the

actual environment, in which a plurality of different types of CPEs can access a plurality of

different types of services provided by service providers which may utilize different types of

transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208

connects service providers who may have their own networks or may utilize any of a plurality of

transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39).

**a control device connected to the IP packet switching device and the line switching**
**device for directing the IP data packets from the multiple origin end terminals to either the**
**packet switching device or to the line switching device,**

Focsaneanu discloses a control device such as processor 246 and/or controller 252, which are

connected to the packet switching device and the line switching device for directing the data

packets from the multiple origin end terminals to either the packet switching device or to the line

switching device.

Focsaneanu discloses the function and corresponding structure (the processor) for

changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of

the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8

and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either

POTS service [Line Switching] or data services [Packet Switching] in response to the identifying

circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a

call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic

change over is first described: "... change of mode can be... a result of an automated non-

Application/Control Number: 95/001,001                                    Page 25

Art Unit: 3992

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

**the control device being responsive to the data packet headers for controlling the**

**packet switching device and the line switching device for establishing and maintaining**

**respective communication connections for data transfer with real-time properties between**

**origin end terminals and destination end terminals,**

Focsaneanu discloses a control device such as processor 246 and/or controller 252, which

is responsive to the data packet headers for controlling the packet switching device and the line

switching device for establishing and maintaining respective communications connections for

data transfer with real-time properties between origin end terminals and destination end

terminals, (col. 7, lines 10-15,36-39).

**and the control device also being responsive to an overload in the Internet for**

**automatically changing-over from packet-switching transfer of first data of a**

**communications connection to line-switching transfer of second data of the communication**

**connection without interruption of the communications connection when a data blockage**

**occurs in the routing of data packets of the first data of the communications connection**

**through the Internet.**

Focsaneanu discloses the function and corresponding structure (the processor) for

changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of

the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8

and 13) of the second data of the telephone call without interruption of a call-up procedure.

Application/Control Number: 95/001,001                                     Page 26
Art Unit: 3992

Focsaneanu discloses a processor 246 performs a selection and enablement of either POTS

service [Line Switching] or data services [Packet Switching] in response to the identifying

circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a

call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic

change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

### *Regarding claims 102 and 104:*

The rejection was proposed by the third party requester in the request for reexamination,

and it is adopted for the reasons set forth in the request for reexamination at pages 354-355

(claim 102 under Focsaneanu '910) and  page 356-357 (claim 104 under Focsaneanu '910)

which are hereby incorporated by reference.

### *Regarding claim 118:*

**A method of routing IP data packets from multiple origin end terminals in an IP**

**data network, the IP data packets containing headers including information identifying**

**respective origin and destination end terminals in the IP data network, the method**

**comprising:**

Focsaneanu discloses an (Access Module) for switching data packets from multiple

origin end terminals (CPE or data terminal, POTS phone, ISDN terminal or fax), (figs. 7 and 15).

Focsaneanu discloses data networks and database services are accessed using a TCP/IP

protocol, (col. 3, lines 6-7, 45-56; col. 7, lines 15-18). The Examiner notes that it is well known

Application/Control Number: 95/001,001                                      Page 27
Art Unit: 3992

in the art that information sent over the Internet must follow the TCP/IP protocol which requires

headers, and the information regarding the origin address and destination address is contained in

the TCP/IP headers.

**inspecting the IP data packet headers at a switch in the IP data network in order to**

**establish a respective communications connection for IP data packets from at least one of**

**the origin terminals to a destination end terminal in the IP network, the respective**

**communications connection being initiated from the switch by packet switching of IP data**

**packets from the switch, and**

Focsaneanu discloses an Access Module for transferring data packets through a packet

switching (Data) network through which data can be sent for delivery to destination end terminal

s (CPEs). Focsaneanu discloses the Access Module has access to a line-switching network and a

packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the

actual environment, in which a plurality of different types of CPEs can access a plurality of

different types of services provided by service providers which may utilize different types of

transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208

connects service providers who may have their own networks or may utilize any of a plurality of

transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39;

figs. 4-6).

**ensuring that the respective communications connection has a desired bandwidth by**

**changing over, from the packet switching of the IP data packets from the switch, to line**

**switching of the IP data packets from said at least one of the origin end terminals to said**

**destination end terminal, when it is found that the packet switching of the IP data packets
from the switch does not have the desired bandwidth.**

Focsaneanu discloses dynamic conversion of voice call data for the purpose of
completing a call on one network that was started on a different network, dynamic mid call
switching. "The access module also has the capability of providing conversion between
packetized voice and PCM to allow for alternate routing. This allows the use of a multiplicity of
access and transport networks in the establishment, translation, and completion of a service
transaction by the access module under the control of the end user, (col. 13, lines 22-34)

Focsaneanu provides for dynamic traffic load balancing, alternate routing, resource
sharing and service management of the information transfer throughout the network, thereby
minimizing protocol and transport translations between the end points, (col. 14, lines 13-20).

***Regarding claims 119,120,122-125:***

The rejection was proposed by the third party requester in the request for reexamination,
and it is adopted for the reasons set forth in the request for reexamination at pages 354-355
(claim 102 under Focsaneanu '910) and  page 356-357 (claim 104 under Focsaneanu '910)
which are hereby incorporated by reference.

### Issue 2

### Requester Proposed Rejection (Adopted)

6.       Claims 36,37,54,55,60, 61, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 92, 95, 98, 100,
102, 118,120-124 are rejected under 35 U.S.C. 102(e) as being anticipated by Jonas US Patent
6,137,792.

***Regarding claim 36:***

**A method for transferring data selectively by line switching or by packet switching from a first switch to a second switch, the first switch being part of or having access to a line-switching network and a packet switching network, comprising:**

Jonas discloses transferring data selectively by line switching (Bypass Network 30) or by packet switching (Internet 40) from a first switch (Router 20) to a second switch (Router 21), the first switch being part of or having access to a line-switching network (Bypass Network 30) and a packet switching network (Internet 40), (fig. 1; col. 3, lines 35-48)

**a) packetizing the data into data packets in the first switch if the data does not yet exist as data packets;**

Jonas discloses packetizing data into data packets in the first switch if the data does not yet exist as data packets. Jonas teaches that all communications across public packet-switched networks, such as the Internet, are broken up into...packets. Each computer (or "host") connected to the packet-switched network is assigned a unique IP address. Hosts are connected to the public packet-switched networks through routers which interconnect physical networks and perform routing and relaying functions. Every data packet transmitted between two hosts via TCP/IP contains a "header" that includes, among other fields, (i) the internet address of the source host (the host generating and sending the packet) and (ii) the internet address of the destination host (the host intended to receive the packet., (col. 1, lines 30-42). Since every message sent across the Internet by Router 20 (first switch) must be packetized, it is inherent that the data must be packetized before it arrives at Router 20 (first switch), or Router 20 must packetize it.

**b) transferring the data packets from the first switch through the packet-switching network to the second switch;**

Jonas discloses transferring the data packets from the first switch (Router 20) through the

packet-switching network (Internet 40) to the second switch (Router 21). Normally, hosts 1 and 2

would transmit data to each other through routers 20 [first switch] and 21 [first switch] over the

Internet 40 [packet-switching network], (col. 4, lines 13-14).

**c) checking whether a control signal exists for changing-over from the packet-
switching data transfer of the data packets through the packet switching network to a line-
switching connection to the second switch, wherein the control signal is produced by a
network management system;**

Jonas discloses checking for a change over signal to change from the packet switching

network (Internet 40) to a line-switching connection (Bypass Network 30) to the second switch

(Router 21) by a network management system. Jonas teaches watching Internet traffic to

determine if conditions are met to change over from Internet 50 to Bypass Network 30. "Certain

applications, may wish to dynamically take advantage of both the inherent cost benefit of using

the packet-switched Internet and the minimal delay time of circuit-switched telephone network

established having the system monitor the transmission delay between the source router 20 and

destination router 21. If this delay rises above a threshold value the source router 20 will

establish a connection over the bypass network 30. The source router 20 may detect the

transmission delay to the destination router 21 using a variety of measures known to those skilled

in the art, including topological delay time for the transmission...., (col. 5, lines 53-64). The

threshold traffic will trigger a signal for the change over, which is well known in the art.