# EXHIBIT 14

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/010,017 | 08/30/2007 | 6954453 | 8096.048.RXUS00 | 3139 |

28694          7590          02/13/2008

NOVAK DRUCE + QUIGG LLP
1300 EYE STREET NW
SUITE 1000 WEST TOWER
WASHINGTON, DC  20005

| EXAMINER |
|---|
|  |

| ART UNIT | PAPER NUMBER |
|---|---|
|  |  |

DATE MAILED: 02/13/2008

Please find below and/or attached an Office communication concerning this application or proceeding.

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Byron Cooper

Goodwin Procter LLP

Exchange Place

53 State Street

Boston, MA 02109

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/010,017*.

PATENT NO. *6954453*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Office Action in Ex Parte Reexamination* | Control No.<br>90/010,017 | Patent Under Reexamination<br>6954453 | |
|---|---|---|---|
| | Examiner<br>Ovidio Escalante | Art Unit<br>3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a ☒ Responsive to the communication(s) filed on <u>23 November 2007</u> .      b ☐ This action is made FINAL.
c ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1.    ☐ Notice of References Cited by Examiner, PTO-892.        3.    ☐ Interview Summary, PTO-474.

2.    ☐ Information Disclosure Statement, PTO/SB/08.        4.    ☒ *Detailed Action*.

Part II    SUMMARY OF ACTION

1a.    ☒ Claims <u>34-36 and 38</u> are subject to reexamination.

1b.    ☒ Claims <u>1-33 and 37</u> are not subject to reexamination.

2.    ☐ Claims _____ have been canceled in the present reexamination proceeding.

3.    ☐ Claims _____ are patentable and/or confirmed.

4.    ☒ Claims <u>34-36 and 38</u> are rejected.

5.    ☐ Claims _____ are objected to.

6.    ☐ The drawings, filed on _____ are acceptable.

7.    ☐ The proposed drawing correction, filed on _____ has been  (7a)☐ approved  (7b)☐ disapproved.

8.    ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some* c)☐ None    of the certified copies have

    1☐ been received.

    2☐ not been received.

    3☐ been filed in Application No. _____ .

    4☐ been filed in reexamination Control No. _____.

    5☐ been received by the International Bureau in PCT application No. _____.

    * See the attached detailed Office action for a list of the certified copies not received.

9.    ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10.    ☐ Other: _____

cc: Requester (if third party requester)

Application/Control Number:                                          Page 2
90/010,017
Art Unit: 3992

## DETAILED ACTION

1.      This office action is in response to the *exparte* reexamination order mailed on November

23, 2007. Claims 34-36 and 38 are pending in this present *exparte* reexamination application.

### *Status of the Claims*

2.      Original claims 34-36 and 38 are rejected.

### *Claim Rejections - 35 USC § 102*

3.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

4.      Claims 34-36 and 38 are rejected under 35 U.S.C. 102(e) as being anticipated by

Focsaneanu US Patent 5,610,910.

### *Regarding claim 34:*

**Switching apparatus for routing a telephone call comprising non-packetized data**

**from a first end terminal located at a user's premises to a second end terminal located at**

**another user's premises, selectively by line switching or packet switching, the switching**

**apparatus comprising:**

Focsaneanu discloses a switching apparatus (Access Module) for selectively routing a

telephone call from a first end terminal (CPE or data terminal, POTS phone, ISDN terminal or

Application/Control Number:                                          Page 3
90/010,017
Art Unit: 3992

fax) to a second end terminal (CPE), by line or packet switching, (fig. 7; col. 7, lines 29-33; fig.

8; col. 8, lines 4-26; col. 9, lines 14-22).

**means for establishing a connection through a line-switching network to the second**

**end terminal;**

Focsaneanu discloses an access module (234), receives data from the CPE through a line

interface 236. The line interface 236 contains a transceiver 238 with capabilities and a modem

functionality 240, and also contains POTS/codec service 242. The identifying circuit detects and

identifies a service request as a POTS service or data service request, (col. 7, line 68 - col. 8, line

6). A processor 246 performs a <u>selection and enablement of</u> either <u>POTS service</u> (via line

switching network) or data services in response to the identifying circuit, (col. 8, line 12-14; col.

10, lines 10-16). Focsaneanu discloses the calling and called party are connected and a voice call

can proceed when the called party's telephone set goes off-hook, (col. 5, lines 50-65; col. 9, lines

47-59; col. 10, lines 10-16)

**means for line-switching transferring data received from the first end terminal as**

**non-packetized data over the line-switching network to the second end terminal;**

Focsaneanu discloses an access module (234), receives data from the CPE (first end

terminal) through a line interface 236. The line interface 236 contains a transceiver 238 with

capabilities and a modem functionality 240, and also contains POTS/codec service 242. The

identifying circuit detects and identifies a service request as a POTS service (non-packetized data

via line switching network) or data service request, (col. 7, line 68 - col. 8, line 6). Focsaneanu

discloses the calling and called party are connected and a voice call can proceed when the called

party's telephone set (second end terminal) goes off-hook, (col. 5, lines 50-65; col. 9, lines 47-

Application/Control Number:                                    Page 4
90/010,017
Art Unit: 3992

59; col. 10, lines 10-16). Focsaneanu discloses the access module  has the option of handling the

call as a voice call through PSTN, or as a data call by routing it through the data network.

   **means for establishing a connection through a packet-switching network to the**

**second end terminal;**

   Focsaneanu discloses an access module (234), receives data from the

CPE through a line interface 236. The line interface 236 contains a transceiver 238 with

capabilities and a modem functionality 240, and also contains POTS/codec service 242. The

identifying circuit detects and identifies a service request as a POTS service or data service

request, (col. 7, line 68 - col. 8, line 6). Focsaneanu discloses the controller performing address

conversion.. and exchanged packetized data formed at PAD 254 with the data network (packet

switch network), (col. 8, lines 4-26; fig. 10; col. 9, lines 4-22).

   **means for packet-switching transferring data received from the first end terminal as**

**non-packetized data over the packet-switching network to the second end terminal; and**

   Focsaneanu discloses receiving non-packetized data from the first terminal and routing

the voice traffic onto a packet switching network, (col. 11, lines 11-15). Focsaneanu states of

transfer data which can be received from a POTS telephone (non-packetized data) and perform

address conversion and exchange packets with the data network (packet-switching network, (col.

8, lines 12-26).

   **means responsive to a control signal for transferring to a line-switching transfer or**

**a packet-switching transfer to the second end terminal;**

   Focsaneanu discloses checking whether a control signal (from Controller 252 to

Processor 246 in response to "identifying circuit" of transceiver 238 Fig. 7) exists for transferring

Application/Control Number:                                      Page 5
90/010,017
Art Unit: 3992

to a line-switching or a packet switching transfer, (col. 7, line 67-col. 8, line 14; col. 9, lines 31-

33; col. 10, lines 7-24, 42-45; col. 11, lines 60-67).

      **said means responsive to a control signal changing-over to a line-switching data**

**transfer or a packet-switching transfer during the existing transfer with the presence of**

**said control signal.**

      Focsaneanu discloses checking whether a control signal (from Controller 252 to

Processor 246 in response to "identifying circuit" of transceiver 238 Fig. 7) exists for transferring

to a line-switching or a packet switching transfer, (col. 7, line 67-col. 8, line 14; col. 9, lines 31-

33; col. 10, lines 7-24, 42-45; col. 11, lines 60-67).   Focsaneanu discloses that the service

request can come during call initiation or during a call, (abstract; col. 9, lines 49-51; col. 10, lines

32-34; col. 11, lines 7-15).

***Regarding claim 35:***

      **The switch of claim 34, further comprising means to produce the control signal for**

**transferring to a line-switching transfer or a packet-switching transfer to the second end**

**terminal, said control signal being produced automatically when demands on the quality of**

**the data transfer are understepped or exceeded.**

      Focsaneanu  patent discloses the access module can dynamically select a different

network from the one prescribed in the user profile, to carry the packetized data traffic. This

alternate selection will not adversely impact the quality of service (QOS). An example of the use

of this capability is to route data traffic on PSTN during low traffic load periods. Similarly, the

access module can packetize voice at PAD 550 and route voice traffic on a data network. The

Application/Control Number:                                        Page 6
90/010,017
Art Unit: 3992

voice service QOS is maintained by continuous monitoring of the transmission delay, (col.

11, lines 7-15).

*Regarding claim 36:*

      **The switch of claim 34, wherein the data received from the first end terminal are**

**analog data.**

      Focsaneanu teaches producing analog data at a first end terminal, such as a POTS

telephone, (col. 5, lines 47-61). When using a POTS service the data is in analog form, (col. 7,

lines 29-40).

*Regarding claim 38:*

      **The switch of claim 34, wherein the data received from the first end terminal are**

**digital, non-packetized data.**

      Focsaneanu shows connections through a circuit switched network and data switched

network using ISDN calling protocol, which would include digital non-packetized data from the

ISDN terminal 120, (col. 6, lines 3-26). Focsaneanu also discloses that FIG. 6 is an illustration of

another known instance where a connection is desired between an ISDN terminal and an

ordinary telephone or a computer, <u>both connected through an analog subscriber loop</u>. A circuit

switched connection is set up in each direction and maintained in a similar fashion, as shown in

FIGS. 4 and 5.


5.      Claims 34-36 and 38 are rejected under 35 U.S.C. 102(e) as being anticipated by White

US Patent 6,069,890.

*Regarding claim 34:*

Application/Control Number:                                              Page 7
90/010,017
Art Unit: 3992

**Switching apparatus for routing a telephone call comprising non-packetized data from a first end terminal located at a user's premises to a second end terminal located at another user's premises, selectively by line switching or packet switching, the switching apparatus comprising:**

White discloses a system and switching apparatus whereby an analog PSTN phone generating non-packetized data may be used to carry out telephone calls over the PSTN, or may also be used to make phone calls that are routed over the Internet, (fig. 2; col. 5, lines 8-16, 52-63). White discloses public switched telephone networks utilizing program controlled switching systems are arranged in an architecture with the Internet to provide a methodology for facilitating telephone use of the Internet by customers on an impromptu basis. Provision is made to permit a caller to set-up and carry out a telephone call over the Internet from telephone to telephone, (col. 4, lines 8-15). The routing of the call over the Internet may be caused by the user dialing a special access code (e.g., *82), (col. 5, line 64) or may be done independently by the telephone company providing a control signal (col. 3, lines 58-61).

**means for establishing a connection through a line-switching network to the second end terminal;**

White discloses means for establishing a connection through the line-switched PSTN to the destination end terminal. The calling telephone, or first end terminal, is depicted as a telephone 56, which may be a POTS telephone generating non- packetized data. The telephone 56 is connected to a central office switch 50, which is in turn connected by lines 54 to the PSTN cloud 57. A second central office switch 52 at the destination end is also connected to the PSTN cloud 57. A destination telephone 58 is connected to the destination central office switch 52. A

Application/Control Number:                                    Page 8
90/010,017
Art Unit: 3992

telephone call across the PSTN can be made by conventional dialing, without the use of the

special prefix that identifies a call as an Internet call, (fig. 2; col. 5, lines 8-16, 55-63).

**means for line-switching transferring data received from the first end terminal as**

**non-packetized data over the line-switching network to the second end terminal;**

White discloses means for establishing a connection through the line-switched PSTN to

the destination end terminal. The calling telephone, or first end terminal, is depicted as a

telephone 56, which may be a POTS telephone generating non- packetized data. The telephone

56 is connected to a central office switch 50, which is in turn connected by lines 54 to the PSTN

cloud 57. A second central office switch 52 at the destination end is also connected to the PSTN

cloud 57. A destination telephone 58 is connected to the destination central office switch 52, (fig.

2; col. 5, lines 8-16, 55-63).

**means for establishing a connection through a packet-switching network to the**

**second end terminal;**

White discloses at col. 5, line 52 - col. 6, line 45 how a call originating at the POTS

telephone 56 (non-packetized data) is caused to be routed through the Internet Module 72 (packet

network) and to the called party (second end terminal), (fig. 2; col. 5, lines 8-37, 55-57 "The

subscriber in this example uses the POTS station at 56 to initiate an Internet call to a called party

at the POTS station 58.").

A structure of the Internet Module is shown in Figure 3. As stated at col. 5, line 51, the

Internet Module includes a router 85 "of the type now generally used in Internet practice," and

may have an interface with processing capability as shown in 87, and may also be connected to a

Application/Control Number:                                    Page 9
90/010,017
Art Unit: 3992

domain name server and a dynamic host configuration protocol server 91 of the type

conventionally used by Internet service providers, (col. 5, lines 52-65).

**means for packet-switching transferring data received from the first end terminal as**

**non-packetized data over the packet-switching network to the second end terminal; and**

White discloses at cols. 5, line 52 - col. 6, line 45 how a call originating at the POTS

telephone 56 is caused to be routed through the Internet Module 72 and to the called party at the

POTS station 58, (fig. 2; col. 5, lines 8-37, 55-57 ).

**means responsive to a control signal for transferring to a line-switching transfer or**

**a packet-switching transfer to the second end terminal;**

White discloses means responsive to a control signal for transferring from an initial line

switching transfer of a telephone call originated by an analog POTS telephone to a packet

switching transfer of the telephone call over the packet switched Internet to the second end

terminal.  As stated in White, a call that originates as a line-switched call from a POTS telephone

may be changed into a packet switched call over the Internet by means of a control signal

generated by the user dialing a special access code (e.g., *82), (col. 5, line 64). Alternatively,

White suggests that the change-over may be caused independently by the telephone company

providing its own control signal, (col. 3, line 58-61).

**said means responsive to a control signal changing-over to a line-switching data**

**transfer or a packet-switching transfer during the existing transfer with the presence of**

**said control signal.**

White discloses means (either the central office switch 50 and the Internet Module 72 as

in Figure 2, or the end office terminal 105 and the Gateway Router 104 as in Figure 4), are

Application/Control Number:                                    Page 10
90/010,017
Art Unit: 3992

responsive to the control signal (the prefix *82 dialed by the user) to cause the telephone call to

change over from the line switching data transfer over the local loop or the LEC to the packet

switching transfer from the Internet Module or Gateway Router over the Internet to the

corresponding destination module/router and then to the second end terminal. The presence of

the control signal is what causes the change over to occur. All of this occurs within the context of

a single telephone call, as dialed originally by the user of the first end terminal POTS telephone.


*Regarding claim 36:*

**The switch of claim 34, wherein the data received from the first end terminal are**

**analog data.**

White discloses a system where an analog PSTN phone may be used to carry out standard

telephone calls in analog form to the central office switch 50 and thereby over the PSTN, or may

also be used to cause phone calls to be routed over the Internet. White states public switched

telephone networks utilizing program controlled switching systems are arranged in an

architecture with the Internet to provide a methodology for facilitating telephone use of the

Internet by customers on an impromptu basis, (col. 4, lines 7-12).


*Regarding claim 38:*

**The switch of claim 34, wherein the data received from the first end terminal are**

**digital, non-packetized data.**

White discloses a system and switching apparatus whereby an analog PSTN phone

generating non-packetized data may be used to carry out telephone calls over the PSTN, or may

Application/Control Number:                                         Page 11
90/010,017
Art Unit: 3992

also be used to make phone calls that are routed over the Internet, (fig. 2; col. 5, lines 8-16, 52-

63). At Col. 7, lines 13-17, White describes how digitized speech in DS0 format is arriving at

the Internet Module 72, for packetization and then transmission over the Internet. The originating

Internet Module 72 is receiving from the originating central office 50 over the trunk connection

digitized speech in DS0 format. The Internet Module implements the function of a packet

assembler and disassembler or PAD and assembles packets in TCP/IP format. At the receiving

end, the switching system in that office converts the DS0 to analog and delivers the analog

speech signal over the destination local loop to the destination telephone station, (col. 7, lines 28-

31).

### *Claim Rejections - 35 USC § 103*

6.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

7.      The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148 USPQ 459

(1966), that are applied for establishing a background for determining obviousness under 35

U.S.C. 103(a) are summarized as follows:

    1.   Determining the scope and contents of the prior art.
    2.   Ascertaining the differences between the prior art and the claims at issue.
    3.   Resolving the level of ordinary skill in the pertinent art.
    4.   Considering objective evidence present in the application indicating obviousness
         or nonobviousness.

Application/Control Number:                                              Page 12
90/010,017
Art Unit: 3992

8.      Claims 34,36 and 38 are rejected under 35 U.S.C. 103(a) as being unpatentable over

White US Patent 6,069,890 in view of Jonas US Patent 6,137,792 or Farese US Patent 4,996,685.

***Regarding claim 34:***

        **Switching apparatus for routing a telephone call comprising non-packetized data**

**from a first end terminal located at a user's premises to a second end terminal located at**

**another user's premises, selectively by line switching or packet switching, the switching**

**apparatus comprising:**

        White discloses a system and switching apparatus whereby an analog PSTN phone

generating non-packetized data may be used to carry out telephone calls over the PSTN, or may

also be used to make phone calls that are routed over the Internet, (fig. 2; col. 5, lines 8-16, 52-

63). White discloses public switched telephone networks utilizing program controlled switching

systems are arranged in an architecture with the Internet to provide a methodology for facilitating

telephone use of the Internet by customers on an impromptu basis. Provision is made to permit a

caller to set-up and carry out a telephone call over the Internet from telephone to telephone, (col.

4, lines 8-15). The routing of the call over the Internet may be caused by the user dialing a

special access code (e.g., *82), (col. 5, line 64) or may be done independently by the telephone

company providing a control signal (col. 3, lines 58-61).

        **means for establishing a connection through a line-switching network to the second**

**end terminal;**

        White discloses means for establishing a connection through the line-switched PSTN to

the destination end terminal. The calling telephone, or first end terminal, is depicted as a

telephone 56, which may be a POTS telephone generating non- packetized data. The telephone

Application/Control Number:                                    Page 13
90/010,017
Art Unit: 3992

56 is connected to a central office switch 50, which is in turn connected by lines 54 to the PSTN

cloud 57. A second central office switch 52 at the destination end is also connected to the PSTN

cloud 57. A destination telephone 58 is connected to the destination central office switch 52. A

telephone call across the PSTN can be made by conventional dialing, without the use of the

special prefix that identifies a call as an Internet call, (fig. 2; col. 5, lines 8-16, 55-63).

   **means for line-switching transferring data received from the first end terminal as**
**non-packetized data over the line-switching network to the second end terminal;**

   White discloses means for establishing a connection through the line-switched PSTN to

the destination end terminal. The calling telephone, or first end terminal, is depicted as a

telephone 56, which may be a POTS telephone generating non- packetized data. The telephone

56 is connected to a central office switch 50, which is in turn connected by lines 54 to the PSTN

cloud 57. A second central office switch 52 at the destination end is also connected to the PSTN

cloud 57. A destination telephone 58 is connected to the destination central office switch 52, (fig.

2; col. 5, lines 8-16, 55-63).

   **means for establishing a connection through a packet-switching network to the**
**second end terminal;**

   White discloses at col. 5, line 52 - col. 6, line 45 how a call originating at the POTS

telephone 56 (non-packetized data) is caused to be routed through the Internet Module 72 (packet

network) and to the called party (second end terminal), (fig. 2; col. 5, lines 8-37, 55-57 "The

subscriber in this example uses the POTS station at 56 to initiate an Internet call to a called party

at the POTS station 58.").

Application/Control Number:                                    Page 14
90/010,017
Art Unit: 3992

A structure of the Internet Module is shown in Figure 3. As stated at col. 5, line 51, the

Internet Module includes a router 85 "of the type now generally used in Internet practice," and

may have an interface with processing capability as shown in 87, and may also be connected to a

domain name server and a dynamic host configuration protocol server 91 of the type

conventionally used by Internet service providers, (col. 5, lines 52-65).

**means for packet-switching transferring data received from the first end terminal as**

**non-packetized data over the packet-switching network to the second end terminal; and**

White discloses at cols. 5, line 52 - col. 6, line 45 how a call originating at the POTS

telephone 56 is caused to be routed through the Internet Module 72 and to the called party at the

POTS station 58, (fig. 2; col. 5, lines 8-37, 55-57 ).

**means responsive to a control signal for transferring to a line-switching transfer or**

**a packet-switching transfer to the second end terminal;**

White discloses means responsive to a control signal for transferring from an initial line

switching transfer of a telephone call originated by an analog POTS telephone to a packet

switching transfer of the telephone call over the packet switched Internet to the second end

terminal. As stated in White, a call that originates as a line-switched call from a POTS telephone

may be changed into a packet switched call over the Internet by means of a control signal

generated by the user dialing a special access code (e.g., *82), (col. 5, line 64). Alternatively,

White suggests that the change-over may be caused independently by the telephone company

providing its own control signal, (col. 3, line 58-61).

Application/Control Number:                                      Page 15
90/010,017
Art Unit: 3992

**said means responsive to a control signal changing-over to a line-switching data**

**transfer or a packet-switching transfer during the existing transfer with the presence of**

**said control signal.**

White discloses means (either the central office switch 50 and the Internet Module 72 as

in Figure 2, or the end office terminal 105 and the Gateway Router 104 as in Figure 4), are

responsive to the control signal (the prefix *82 dialed by the user) to cause the telephone call to

change over from the line switching data transfer over the local loop or the LEC to the packet

switching transfer from the Internet Module or Gateway Router over the Internet to the

corresponding destination module/router and then to the second end terminal. The presence of

the control signal is what causes the change over to occur. All of this occurs within the context of

a single telephone call, as dialed originally by the user of the first end terminal POTS telephone.

In addition to the anticipation rejection with White as shown above, the Examiner notes,

if the claim is interpreted as having the "changing over" limitation take place during an existing

established communication between the first and second parties, then White does not specifically

disclose of the transferring occurring during this communication since White shows the changing

over before the two parties are connected but within a single telephone call. The Examiner notes,

however, that White suggests that the Telco could perform the change-over and if so, this change

would be transparent to the customer, (col. 3, lines 57-60). Thus it will be obvious the Telco may

have control of when the change-over is implemented.

Nonetheless, it was well known in the art to change over to a line-switching or packet-

switching during an existing transfer during a communication in response to a control signal.

Application/Control Number:                                    Page 16
90/010,017
Art Unit: 3992

As disclosed by Farese, a multitude of users can dynamically change between circuit and

packet switch in accordance with communication requirements of each user, (col. 13, lines 3-10).

Farese discloses that the host computer could analyze the actual communication and decide

based upon various rules the specific threshold for duration and/or amount of communication

flowing in each direction, (col. 13, lines 3-10).

In addition to Farese, Jonas discloses once a connection between a source and destination

has been established the source can monitor for transmission delay and will dynamically connect

to a bypass network (circuit switch), (col. 3, lines 15-23; col. 4, lines 13-21; fig. 1).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the

invention was made to modify White by allowing for a change during an existing transfer, as

taught by either Farese or Jonas, in order to allow for switching over from packet to circuit or

vise versa in order to dynamically take advantage of both the inherent cost benefit of using the

packet-switched Internet and the minimal delay time of circuit-switched telephone networks

depending on the connection, (col. 3, lines 13-23, 30-34).

***Regarding claim 36:***

**The switch of claim 34, wherein the data received from the first end terminal are**

**analog data.**

White discloses a system where an analog PSTN phone may be used to carry out standard

telephone calls in analog form to the central office switch 50 and thereby over the PSTN, or may

also be used to cause phone calls to be routed over the Internet. White states public switched

telephone networks utilizing program controlled switching systems are arranged in an

Application/Control Number:                                                    Page 17
90/010,017
Art Unit: 3992

architecture with the Internet to provide a methodology for facilitating telephone use of the

Internet by customers on an impromptu basis, (col. 4, lines 7-12).


*Regarding claim 38:*

**The switch of claim 34, wherein the data received from the first end terminal are**

**digital, non-packetized data.**

White discloses a system and switching apparatus whereby an analog PSTN phone

generating non-packetized data may be used to carry out telephone calls over the PSTN, or may

also be used to make phone calls that are routed over the Internet, (fig. 2; col. 5, lines 8-16, 52-

63). At Col. 7, lines 13-17, White describes how digitized speech in DS0 format is arriving at

the Internet Module 72, for packetization and then transmission over the Internet. The originating

Internet Module 72 is receiving from the originating central office 50 over the trunk connection

digitized speech in DS0 format. The Internet Module implements the function of a packet

assembler and disassembler or PAD and assembles packets in TCP/IP format. At the receiving

end, the switching system in that office converts the DS0 to analog and delivers the analog

speech signal over the destination local loop to the destination telephone station, (col. 7, lines 28-

31).


9.      Claim 34, 36 and 38 are rejected under 35 U.S.C. 103(a) as being unpatentable over

White US Patent 6,069,890 in view of Focsaneanu US Patent 5,610,910 or Lucent Technologies

pre Release (hereinafter Lucent).

        *Regarding claim 34:*

Application/Control Number:                                         Page 18
90/010,017
Art Unit: 3992

**Switching apparatus for routing a telephone call comprising non-packetized data**
**from a first end terminal located at a user's premises to a second end terminal located at**
**another user's premises, selectively by line switching or packet switching, the switching**
**apparatus comprising:**

White discloses a system and switching apparatus whereby an analog PSTN phone
generating non-packetized data may be used to carry out telephone calls over the PSTN, or may
also be used to make phone calls that are routed over the Internet, (fig. 2; col. 5, lines 8-16, 52-
63). White discloses public switched telephone networks utilizing program controlled switching
systems are arranged in an architecture with the Internet to provide a methodology for facilitating
telephone use of the Internet by customers on an impromptu basis. Provision is made to permit a
caller to set-up and carry out a telephone call over the Internet from telephone to telephone, (col.
4, lines 8-15). The routing of the call over the Internet may be caused by the user dialing a
special access code (e.g., *82), (col. 5, line 64) or may be done independently by the telephone
company providing a control signal (col. 3, lines 58-61).

**means for establishing a connection through a line-switching network to the second**
**end terminal;**

White discloses means for establishing a connection through the line-switched PSTN to
the destination end terminal. The calling telephone, or first end terminal, is depicted as a
telephone 56, which may be a POTS telephone generating non- packetized data. The telephone
56 is connected to a central office switch 50, which is in turn connected by lines 54 to the PSTN
cloud 57. A second central office switch 52 at the destination end is also connected to the PSTN
cloud 57. A destination telephone 58 is connected to the destination central office switch 52. A

Application/Control Number:                                    Page 19
90/010,017
Art Unit: 3992

telephone call across the PSTN can be made by conventional dialing, without the use of the

special prefix that identifies a call as an Internet call, (fig. 2; col. 5, lines 8-16, 55-63).

**means for line-switching transferring data received from the first end terminal as**

**non-packetized data over the line-switching network to the second end terminal;**

White discloses means for establishing a connection through the line-switched PSTN to

the destination end terminal. The calling telephone, or first end terminal, is depicted as a

telephone 56, which may be a POTS telephone generating non- packetized data. The telephone

56 is connected to a central office switch 50, which is in turn connected by lines 54 to the PSTN

cloud 57. A second central office switch 52 at the destination end is also connected to the PSTN

cloud 57. A destination telephone 58 is connected to the destination central office switch 52, (fig.

2; col. 5, lines 8-16, 55-63).

**means for establishing a connection through a packet-switching network to the**

**second end terminal;**

White discloses at col. 5, line 52 - col. 6, line 45 how a call originating at the POTS

telephone 56 (non-packetized data) is caused to be routed through the Internet Module 72 (packet

network) and to the called party (second end terminal), (fig. 2; col. 5, lines 8-37, 55-57 "The

subscriber in this example uses the POTS station at 56 to initiate an Internet call to a called party

at the POTS station 58.").

A structure of the Internet Module is shown in Figure 3. As stated at col. 5, line 51, the

Internet Module includes a router 85 "of the type now generally used in Internet practice," and

may have an interface with processing capability as shown in 87, and may also be connected to a

Application/Control Number:                                          Page 20
90/010,017
Art Unit: 3992

domain name server and a dynamic host configuration protocol server 91 of the type

conventionally used by Internet service providers, (col. 5, lines 52-65).

**means for packet-switching transferring data received from the first end terminal as**

**non-packetized data over the packet-switching network to the second end terminal; and**

White discloses at cols. 5, line 52 - col. 6, line 45 how a call originating at the POTS

telephone 56 is caused to be routed through the Internet Module 72 and to the called party at the

POTS station 58, (fig. 2; col. 5, lines 8-37, 55-57 ).

**means responsive to a control signal for transferring to a line-switching transfer or**

**a packet-switching transfer to the second end terminal;**

White discloses means responsive to a control signal for transferring from an initial line

switching transfer of a telephone call originated by an analog POTS telephone to a packet

switching transfer of the telephone call over the packet switched Internet to the second end

terminal.  As stated in White, a call that originates as a line-switched call from a POTS telephone

may be changed into a packet switched call over the Internet by means of a control signal

generated by the user dialing a special access code (e.g., *82), (col. 5, line 64). Alternatively,

White suggests that the change-over may be caused independently by the telephone company

providing its own control signal, (col. 3, line 58-61).

**said means responsive to a control signal changing-over to a line-switching data**

**transfer or a packet-switching transfer during the existing transfer with the presence of**

**said control signal.**

White discloses means (either the central office switch 50 and the Internet Module 72 as

in Figure 2, or the end office terminal 105 and the Gateway Router 104 as in Figure 4), are

Application/Control Number:                                    Page 21
90/010,017
Art Unit: 3992

responsive to the control signal (the prefix *82 dialed by the user) to cause the telephone call to

change over from the line switching data transfer over the local loop or the LEC to the packet

switching transfer from the Internet Module or Gateway Router over the Internet to the

corresponding destination module/router and then to the second end terminal. The presence of

the control signal is what causes the change over to occur. All of this occurs within the context of

a single telephone call, as dialed originally by the user of the first end terminal POTS telephone.

In addition to the anticipation rejection with White as shown above, the Examiner notes,

if the claim is interpreted as having the "changing over" limitation take place during an existing

established communication between the first and second end terminals, then White does not

specifically disclose of the transferring occurring during this communication since White shows

the changing over before the end terminals are connected but within a single telephone call. The

Examiner notes, however, that White suggests that the Telco could perform the change-over and

if so, this change would be transparent to the customer, (col. 3, lines 57-60). Thus it would be

obvious the Telco may have control of when the change-over will be implemented.

Nonetheless, it was well known in the art to change over to a line-switching or packet-

switching during an existing transfer during a communication in response to a control signal.

Focsaneanu discloses checking whether a control signal (from Controller 252 to

Processor 246 in response to "identifying circuit" of transceiver 238 Fig. 7) exists for transferring

to a line-switching or a packet switching transfer, (col. 7, line 67-col. 8, line 14; col. 9, lines 31-

33; col. 10, lines 7-24, 42-45; col. 11, lines 60-67).   Focsaneanu discloses that the service

request can be initiated during a communication service (abstract; col. 9, lines 49-51; col. 10,

lines 32-34; col. 11, lines 7-15).

Application/Control Number:                                          Page 22
90/010,017
Art Unit: 3992

In addition to Focsaneanu, Lucent discloses network management software will be able to transparent route traffic of Internet or the public network. Lucent also sated if the Internet becomes too congested, the serve could switch the transmission back to the public network, (page 1 - paragraph 6).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to modify White by allowing for a change during an existing transfer, as taught by either Focsaneanu or Lucent, in order to allow for switching over from packet to circuit or vise versa in order to dynamically take advantage of both the inherent cost benefit of using the packet-switched Internet and the minimal delay time of circuit-switched telephone networks depending on the connection. Lucent also specifically discloses that if the Internet was "too congested" then the server could switch transmission back to the public network. Lucent in paragraphs 2-3 also states that routing voice traffic through the Internet provides cost savings and routing through public networks provide quality, reliability and security, thus one skilled in the art would have found it obvious to allow the Telco system in White to transparently change-over during an existing transfer in order to provide these benefits.

### Conclusion

### NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that:

The patent owner's correspondence address for all communications in an *ex parte* reexamination or an *inter partes* reexamination is designated as the correspondence address of the patent.

*Revisions and Technical Corrections Affecting Requirements for Ex Parte and Inter Partes Reexamination*, 72 FR 18892 (April 16, 2007)(Final Rule)

Application/Control Number:                                    Page 23
90/010,017
Art Unit: 3992

**The correspondence address for any pending reexamination proceeding not having the same correspondence address as that of the patent is, by way of this revision to 37 CFR 1.33(c), automatically changed to that of the patent file as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as of May 16, 2007, including the present reexamination proceeding, and to any reexamination proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct communications accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for the present proceeding is different from the correspondence address of the patent, it is strongly encouraged that the patent owner affirmatively file a Notification of Change of Correspondence Address in the reexamination proceeding and/or the patent (depending on which address patent owner desires), to conform the address of the proceeding with that of the patent and to clarify the record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

Reexamination and Amendment Practice          (571) 272-7703
Central Reexam Unit (CRU)                     (571) 272-7705
Reexamination Facsimile Transmission No.      (571) 273-9900

### *Submissions*

10.    In order to ensure full consideration of any amendments, affidavits or declarations, or

other documents as evidence of patentability, such documents must be submitted in response to

this Office action.  Submissions after the next Office action, which is intended to be a final

action, will be governed by the requirements of 37 CFR 1.116, after final rejection and 37 CFR

41.33 after appeal, which will be strictly enforced.

### *Notification of Concurrent Proceedings*

11.    The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Application/Control Number:                                      Page 24
90/010,017
Art Unit: 3992

Patent No. 6,954,453 throughout the course of this reexamination proceeding. The third party

requester is also reminded of the ability to similarly apprise the Office of any such activity or

proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282

and 2286.

### *Extension of Time*

12.    Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding. Additionally, 35 U.S.C. 305 requires that reexamination proceedings

"will be conducted with special dispatch" (37 CFR 1.550(a)). Extension of time in *ex parte*

reexamination proceedings are provided for in 37 CFR 1.550(c).

13.    A shortened statutory period for response to the action is set to expire 2 months from the

mailing date of this action.

**14.    All correspondence related to this *ex parte* reexamination proceeding should be**

**directed as follows:**

Please MAIL any communications to:

Attn: Mail Stop *Ex Parte* Reexam
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

Please FAX any communication to:

(571) 273-9900
Central Reexamination Unit

Please HAND-DELIVER any communications to:

Application/Control Number:                                          Page 25
90/010,017
Art Unit: 3992


Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA 22314

15.     Any inquiry by the patent owner concerning this communication or earlier

communications from the Legal Advisor or Examiner, or as to the status of this proceeding,

should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.



*Ovidio Escalante*

Ovidio Escalante
Primary Examiner
Central Reexamination Unit - Art Unit 3992
(571) 272-7537


Conferee:                                  Conferee:

*Roland Foster*                            *ESK*
Roland Foster
CRU 3992                                   ERIC S. KEASEL
                                           CRU SPE-AU 3992

EXHIBIT 15

| 90/010,017 | Method for Transmitting Data in a Telecommunications Network and Switch for Implementing Said Method | 05-08-2008::10:12:42 |
|---|---|---|

## Transaction History

| Date | Transaction Description |
|---|---|
| 04-30-2008 | Certificate of Service |
| 04-30-2008 | Supplemental Response after Non-Final Rejection |
| 04-28-2008 | Certificate of Service |
| 04-28-2008 | Response after Non-Final Action |
| 04-10-2008 | Extension of Time Period for Response Granted |
| 04-01-2008 | Certificate of Service |
| 04-01-2008 | Request for Extension of Time |
| 02-13-2008 | Reexam Non-Final Action Mailed |
| 02-11-2008 | Case Docketed to Examiner in GAU |
| 02-08-2008 | IFW Scan & PACR Auto Security Review |
| 02-05-2008 | Reexam Litigation Search Conducted |
| 01-23-2008 | Date Forwarded to Examiner |
| 11-23-2007 | Determination -- Reexam Ordered |
| 09-27-2007 | Case Docketed to Examiner in GAU |
| 09-06-2007 | Reexam Litigation Search Conducted |
| 09-05-2007 | Completion of Preprocessing - Released to Assigned GAU |
| 09-05-2007 | Notice of assignment of reexamination request |
| 09-05-2007 | Notice of reexamination request filing date |
| 09-05-2007 | Title Report |
| 08-30-2007 | Reexamination requested by third party requester |
| 08-30-2007 | Receipt of Original Ex Parte Reexam Request |
| 09-05-2007 | Application Is Now Complete |
| 10-02-2007 | Notice of Reexam Published in Official Gazette |
| 08-30-2007 | Initial Exam Team nn |

EXHIBIT 16

| 90/010,017 | Method for Transmitting Data in a Telecommunications Network and Switch for Implementing Said Method | 05-08-2008::10:18:08 |

## Transaction History

| Date | Transaction Description |
| --- | --- |
| 04-30-2008 | Certificate of Service |
| 04-30-2008 | Supplemental Response after Non-Final Rejection |
| 04-28-2008 | Certificate of Service |
| 04-28-2008 | Response after Non-Final Action |
| 04-10-2008 | Extension of Time Period for Response Granted |
| 04-01-2008 | Certificate of Service |
| 04-01-2008 | Request for Extension of Time |
| 02-13-2008 | Reexam Non-Final Action Mailed |
| 02-11-2008 | Case Docketed to Examiner in GAU |
| 02-08-2008 | IFW Scan & PACR Auto Security Review |
| 02-05-2008 | Reexam Litigation Search Conducted |
| 01-23-2008 | Date Forwarded to Examiner |
| 11-23-2007 | Determination -- Reexam Ordered |
| 09-27-2007 | Case Docketed to Examiner in GAU |
| 09-06-2007 | Reexam Litigation Search Conducted |
| 09-05-2007 | Completion of Preprocessing - Released to Assigned GAU |
| 09-05-2007 | Notice of assignment of reexamination request |
| 09-05-2007 | Notice of reexamination request filing date |
| 09-05-2007 | Title Report |
| 08-30-2007 | Reexamination requested by third party requester |
| 08-30-2007 | Receipt of Original Ex Parte Reexam Request |
| 09-05-2007 | Application Is Now Complete |
| 10-02-2007 | Notice of Reexam Published in Official Gazette |
| 08-30-2007 | Initial Exam Team nn |

# EXHIBIT 17

## FULLY REDACTED

EXHIBIT 18

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

_Inter Partes_ Reexamination Filing Data - June 30, 2007

1. Total requests filed since start of _inter partes_ reexam on 11/29/99 ................................ 272[1]

2. Number of filings by discipline

   a. Chemical Operation     69    25%
   b. Electrical Operation     98    36%
   c. Mechanical Operation    105    39%

3. Annual Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 2000 | 0 | 2002 | 4 | 2004 | 27 | 2006 | 70 |
| 2001 | 1 | 2003 | 21 | 2005 | 59 | 2007 | 90 |

4. Number known to be in litigation…………………………………………137………………50%

5. Decisions on requests ...................................................................................................... 232

   a. No. granted .................................................................................... 223 ................. 96%

      (1) By examiner      2238
      (2) By Director (on petition)    0

   b. No. not granted ................................................................................... 9 .................... 4%

      (1) By examiner      7
      (2) Reexam vacated    2

6. Overall reexamination pendency  (Filing date to certificate issue date)

   a. Average pendency      29.1 (mos.)
   b. Median pendency      30.4 (mos.)

7. Total inter partes reexamination certificates issued (1999 - present) .................................. 8

   a. Certificates with all claims confirmed    1      12%
   b. Certificates with all claims canceled    7      88%
   c. Certificates with claims changes     0       0%

---

[1]Of the requests received through June 30, 2007, 1 proceeding was vacated per 37 CFR 1.913; and 7 requests have not yet been accorded a filing date and preprocessing of 1 request was terminated,, for failure to comply with the requirements of 37 CFR 1.915. See Clarification of Filing Date Requirements for _Ex Parte_ and _Inter Partes_ Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

EXHIBIT 19

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

*Ex Parte* Reexamination Filing Data  - December 31, 2007

1.   Total requests filed since start of ex parte reexam on 07/01/81 . . . . . . . . . . . . . . . . . .  9060[1]

|     |                            |      |     |
|-----|----------------------------|------|-----|
| a.  | By patent owner            | 3495 | 39% |
| b.  | By other member of public  | 5400 | 59% |
| c.  | By order of Commissioner   | 165  | 2%  |

2.   Number of filings by discipline

|     |                      |      |     |
|-----|----------------------|------|-----|
| a.  | Chemical Operation   | 2703 | 30% |
| b.  | Electrical Operation | 3023 | 33% |
| c.  | Mechanical Operation | 3334 | 37% |

3.   Annual Ex Parte Reexam Filings

| Fiscal Yr. | No.          | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|------------|--------------|------------|-----|------------|-----|------------|-----|
| 1981       | 78 (3 mos.)  | 1989       | 243 | 1997       | 376 | 2005       | 524 |
| 1982       | 187          | 1990       | 297 | 1998       | 350 | 2006       | 511 |
| 1983       | 186          | 1991       | 307 | 1999       | 385 | 2007       | 643 |
| 1984       | 189          | 1992       | 392 | 2000       | 318 | 2008       | 165 |
| 1985       | 230          | 1993       | 359 | 2001       | 296 |            |     |
| 1986       | 232          | 1994       | 379 | 2002       | 272 |            |     |
| 1987       | 240          | 1995       | 392 | 2003       | 392 |            |     |
| 1988       | 268          | 1996       | 418 | 2004       | 441 |            |     |

4.   Number known to be in litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2398     26%

5.   Determinations on requests  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8714

a.   No. granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7998 . . . . . . . . .  92%

(1)  By examiner                       7885
(2)  By Director (on petition)          113

b.   No. denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  716 . . . . . . . . . .  8%

(1)  By examiner                       681
(2)  Order vacated                      35

---

[1]Of the requests received in FY 2008, 23 requests have not yet been accorded a filing date, and preprocessing of 3 requests was terminated for failure to comply with the requirements of 37 CFR 1.510.  See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

1

6.    Total examiner denials (includes denials reversed by Director)  . . . . . . . . . . . . . . . . . . .  794

      a.  Patent owner requester                          439      55%
      b.  Third party requester                            355      45%

7.    Overall reexamination pendency  (Filing date to certificate issue date)

      a.  Average pendency                           24.0 (mos.)
      b.  Median pendency                           18.6 (mos.)

8.  Reexam certificate claim analysis:

| | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|
| a.  All claims confirmed | 23% | 29% | 12% | 26% |
| b.  All claims cancelled | 7% | 12% | 21% | 10% |
| c.  Claims changes | 70% | 59% | 67% | 64% |

9.    Total ex parte reexamination certificates issued (1981 - present)  . . . . . . . . . . . . . . . . .  6066

      a.  Certificates with all claims confirmed           1556   26%
      b.  Certificates with all claims canceled            636   10%
      c.  Certificates with claims changes            3874   64%

10.  Reexam claim analysis - requester is patent owner or 3rd party; or Comm'r initiated.

      a.  Certificates - PATENT OWNER REQUESTER . . . . . . . . . . . . . . . . . . . . . . . . . . .  2607

            (1)  All claims confirmed               592   23%
            (2)  All claims canceled              194   7%
            (3)  Claim changes                1821   70%

      b.  Certificates - 3rd PARTY REQUESTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3313

            (1)  All claims confirmed               946   29%
            (2)  All claims canceled               413   12%
            (3)  Claim changes                1954   59%

      c.  Certificates - COMM'R INITIATED REEXAM . . . . . . . . . . . . . . . . . . . . . . . . . . .  146

            (1)  All claims confirmed                18   12%
            (2)  All claims canceled                30   21%
            (3)  Claim changes                  98   67%

EXHIBIT 20

All petitions to merge or stay which are filed by the patent owner or the third party requester subsequent to the date of the order for reexamination will be referred to the OPLA for decision.

## VI. FEES IN MERGED PROCEEDINGS

Where the proceedings have been merged and a paper is filed which requires payment of a fee (e.g., excess claims fee, extension of time fee, petition fees, appeal fees, brief fees, oral hearing fees), only a single fee need be paid. For example, only one fee need be paid for an appellant brief, even though the brief relates to merged multiple examinations and copies of the brief are filed for each file in the merger (as is required). As to excess claim fees, reissue practice will control.

## VII. INTERVIEWS IN MERGED PROCEED-INGS

Pursuant to 37 CFR 1.955, an interview which discusses the merits of a proceeding is not permitted in an *inter partes* reexamination proceeding. Thus, in a merged proceeding of an *inter partes* reexamination and a reissue application, there will be no *inter partes* interview as to the substance of the proceeding. Also, there will be no separate *ex parte* interview as to the substance of the proceeding with either the patent owner (the reissue applicant) or the third party requester (of the reexamination). Accordingly, where a party requests any information as to the merits of the merged proceeding, the examiner will not conduct a personal or telephone interview with that party to provide the information. Further, an informal amendment by the patent owner (the reissue applicant) will not be accepted, because that would be tantamount to an *ex parte* interview. All communications between the Office and the patent owner (and the third party requester) which are directed to the merits of the merged proceeding must be in writing and filed with the Office for entry into the record of the proceeding.

## VIII. EXAMINER'S AMENDMENT TO PLACE PROCEEDING IN CONDITION FOR AL-LOWANCE

As pointed out immediately above, interviews, both personal and telephone are **not** permitted in a merged reissue/*inter partes* reexamination proceeding. Thus,

the examiner is not permitted to telephone the patent owner/reissue applicant and obtain authorization to make an amendment. Accordingly, the only times that an examiner's amendment can be made in conjunction with a Notice of Allowability are where the patent owner authorization need not be obtained. Such amendments include:

(A) An examiner's amendment to deal with formal matters such as grammar, incorrect spelling, or incorrect number; i.e., matters that do not involve a rejection, do not go to the merits, and do not require the examiner to obtain approval.

(B) An examiner's amendment to change the title.

See also MPEP § 1302.04 *et seq.* as to examiner's amendments not needing authorization by an applicant or a patent owner. Note, however, that in a merged reissue/*inter partes* reexamination proceeding (as opposed to an application *per se*) all such examiner's amendments must be made by **formal examiner's amendment accompanying the Notice of Allowability**, in order to provide notice of the changes made in the patent being reexamined to both the patent owner/reissue applicant and the third party requester.

Note that any change going to the merits of the case (i.e., more than a formal matter) could not be made by examiner's amendment accompanying the Notice of Allowability. Rather, a change going to the merits would require (A) reopening of prosecution with the approval of the *>CRU< Director, (B) an Office action suggesting the change to the patent owner/reissue applicant, (C) a formal amendment submitted by patent owner/reissue applicant, and (D) an opportunity for the third party requester to comment on the patent owner/applicant's submission.

## 2686.04    Reexamination and Litigation Proceedings [R-5]

*35 U.S.C. 314.    Conduct of inter partes reexamination proceedings.*

*****

(c) SPECIAL DISPATCH.— Unless otherwise provided by the Director for good cause, all inter partes reexamination proceedings under this section, including any appeal to the Board of Patent Appeals and Interferences, shall be conducted with special dispatch within the Office.

2686.04

*35 U.S.C. 317. Inter partes reexamination prohibited.*

\*\*\*\*\*

(b) FINAL DECISION.— Once a final decision has been entered against a party in a civil action arising in whole or in part under section 1338 of title 28, that the party has not sustained its burden of proving the invalidity of any patent claim in suit or if a final decision in an inter partes reexamination proceeding instituted by a third-party requester is favorable to the patentability of any original or proposed amended or new claim of the patent, then neither that party nor its privies may thereafter request an inter partes reexamination of any such patent claim on the basis of issues which that party or its privies raised or could have raised in such civil action or inter partes reexamination proceeding, and an inter partes reexamination requested by that party or its privies on the basis of such issues may not thereafter be maintained by the Office, notwithstanding any other provision of this chapter. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings.

*35 U.S.C. 318. Stay of litigation.*

Once an order for inter partes reexamination of a patent has been issued under section 313, the patent owner may obtain a stay of any pending litigation which involves an issue of patentability of any claims of the patent which are the subject of the inter partes reexamination order, unless the court before which such litigation is pending determines that a stay would not serve the interests of justice.

*37 CFR 1.987. Suspension of inter partes reexamination proceeding due to litigation.*

If a patent in the process of inter partes reexamination is or becomes involved in litigation, the Director shall determine whether or not to suspend the inter partes reexamination proceeding.

*37 CFR 1.907. Inter partes reexamination prohibited.*

\*\*\*\*\*

(b)    Once a final decision has been entered against a party in a civil action arising in whole or in part under 28 U.S.C. 1338 that the party has not sustained its burden of proving invalidity of any patent claim-in-suit, then neither that party nor its privies may thereafter request inter partes reexamination of any such patent claim on the basis of issues which that party, or its privies, raised or could have raised in such civil action, and an inter partes reexamination requested by that party, or its privies, on the basis of such issues may not thereafter be maintained by the Office.

35 U.S.C. 311 permits a request for *inter partes* reexamination to be filed "at any time." Thus, requests for *inter partes* reexamination can be filed where the patent (for which reexamination is requested) is involved in concurrent litigation. The guidelines set forth below will generally govern Office handling of *inter partes* reexamination requests where there is concurrent litigation.

# I.  COURT ORDERED REEXAMINATION PROCEEDING\*>,< LITIGATION STAYED FOR REEXAMINATION>, OR EXTENDED PENDENCY OF REEXAMINATION PROCEEDING CONCURRENT WITH LITIGATION<

Where a request for reexamination indicates that it is filed as a result of an order by a court, or that litigation is stayed for the purpose of reexamination, all aspects of the proceeding will be expedited to the extent possible. Cases will be taken up for action at the earliest time possible, and time periods set in actions may be extended only upon a strong showing of sufficient cause (see MPEP § 2665). Action on such a proceeding will take precedence to any other action taken by the examiner in the Office. See generally *In re Vamco Machine and Tool, Inc.*, 752 F.2d 1564, 224 USPQ 617 (Fed. Cir. 1985); *Gould v. Control Laser Corp.*, 705 F.2d 1340, 217 USPQ 985 (Fed. Cir. 1983); *Loffland Bros. Co. v. Mid-Western Energy Corp.*, 225 USPQ 886 (W.D. Okla. 1985); *The Toro Co. v. R.L. Nelson Corp.*, 223 USPQ 636 (C.D. Ill. 1984); *Digital Magnetic Systems, Inc. v. Ansley*, 213 USPQ 290 (W.D. Okla. 1982); *Raytek, Inc. v. Solfan Systems Inc.*, 211 USPQ 405 (N.D. Cal. 1981); and *Dresser Industries, Inc. v. Ford Motor Co.*, 211 USPQ 1114 (N.D. Texas 1981).

>In addition, if (A) there is litigation concurrent with an *inter partes* reexamination proceeding and (B) the reexamination proceeding has been pending for more than one year, the Director or Deputy Director of the Office of Patent Legal Administration (OPLA), Director of the Central Reexamination Unit (CRU), or a Senior Legal Advisor of the OPLA, may approve Office actions in such reexamination proceeding setting a one-month or thirty days, whichever is longer, shortened statutory period for response rather than the two months usually set in reexamination proceedings. A statement at the end of the Office action – "One month or thirty days, whichever is longer, shortened statutory period approved," followed by the signature of one of these officials, will designate such approval. It is to be noted that the statutory requirement for "special dispatch" in

reexamination often becomes important, and sometimes critical, in coordinating the concurrent litigation and reexamination proceedings.<

## II. FEDERAL COURT DECISION KNOWN TO EXAMINER AT THE TIME THE DETERMINATION ON THE REQUEST FOR REEXAMINATION IS MADE

If a Federal Court decision *on the merits* of a patent is known to the examiner at the time the determination on the request for *inter partes* reexamination is made, the following guidelines will be followed by the examiner:

(A) The Third Party Requester Was <u>Not</u> a Party to the Litigation.

When the initial question as to whether the art raises a substantial new question of patentability as to a patent claim is under consideration, the existence of a final court decision of claim validity in view of the same or different art does not necessarily preclude the presence of a new question. This is true because of the different standards of proof and claim interpretation employed by the District Courts and the Office. See for example *In re Zletz*, 893 F.2d 319, 322, 13 USPQ2d 1320, 1322 (Fed. Cir. 1989) (manner of claim interpretation that is used by courts in litigation is not the manner of claim interpretation that is applicable during prosecution of a pending application before the PTO) and *In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir. 1985) (the 35 U.S.C. 282 presumption of patent validity has no application in reexamination proceedings). Thus, while the Office may accord deference to factual findings made by the court, the determination of whether a substantial new question of patentability exists will be made independently of the court's decision on *validity*, since the decision is <u>not</u> controlling on the Office.

A *non-final* holding of claim *invalidity* or unenforceability will also not be controlling on the question of whether a substantial new question of patentability is present.

*Only a final holding of claim invalidity or unenforceability (after all appeals) is controlling on the Office.* In such cases, a substantial new question of patentability would not be present as to the claims held invalid or unenforceable. See *Ethicon v. Quigg*, 849 F.2d 1422, 7 USPQ2d 1152 (Fed. Cir. 1988).

(B) The Third Party Requester <u>Was a Party</u> to the Litigation.

<u>Final Holding of validity:</u> The provisions of 37 CFR 1.907(b) apply. Where a final decision was entered against a party in a Federal Court civil action (arising in whole or in part under 28 U.S.C. 1338) that the party did not sustain its burden of proving invalidity of a patent claim in suit, that party and its privies may **not** request *inter partes* reexamination of any such patent claim on the basis of issues which that party or its privies raised or could have raised in the civil action. Further, an *inter partes* reexamination already requested by that party, or its privies, on the basis of such issues will not be maintained by the Office, i.e., the proceeding will be concluded. Note, however, that the statute does <u>not</u> preclude an *ex parte* reexamination by the same third party requester.

In view of the above, when the examiner is aware that the third party requester was a party to previous Federal Court litigation as to the patent for which *inter partes* reexamination has been requested, the examiner must determine:

(1) Was the Federal Court decision adverse to the third party requester as to at least one claim of the patent?

(2) Was the Federal Court decision a final decision, after all appeals?

(3) Is the issue being raised in the reexamination request the same issue as was raised in the Federal Court during the civil action, or an issue that the third party requester could have raised in the Federal Court during the civil action?

- If the answer to each of questions (1)-(3) is "yes" for <u>all</u> claims >for which reexamination was requested< in the proceeding, then the *inter partes* reexamination prosecution must be terminated. In such a case, the *>Central Reexamination Unit (CRU)< Director will prepare a decision discussing the above considerations (1)-(3) and vacating the above reexamination proceeding.

- If the answer to all of questions (1)-(3) is "yes" for one or more (but not all) of the claims >for which reexamination was requested< in the proceeding; those claims will not be treated. The examiner's action will point out the claims not treated and the reason why, i.e., a discussion of the above considerations (1)-(3). The guidelines set forth above in subsection II.(A) will be used for the claims remaining.

- If the answer to question (1) or to question (3) is "no" for all claims >for which reexamination was requested<, then the examination of the reexamination proceeding will proceed without any discussion on the record of considerations (1)-(3), using the guidelines set forth above in subsection II.(A).

- If, for any claim >for which reexamination was requested<, the answer to both of questions (1) and (3) is "yes", but the answer to question (2) is "no", then examination of the reexamination proceeding will proceed using the guidelines set forth above in subsection II.(A). The examiner's action will contain a discussion of considerations (1)-(3). If the examiner subsequently becomes aware that the Federal Court decision has become final, reexamination of the affected claims must be discontinued. If all claims >being examined< are affected, the reexamination will be vacated by the *>CRU< Director as discussed above. >See also subsection V. below.<

   Final Holding of invalidity: A *final holding of claim invalidity or unenforceability* (after all appeals) is controlling on the Office. In such cases, a substantial new question of patentability need not be present as to the claims held invalid or unenforceable. See *Ethicon v. Quigg*, 849 F.2d 1422, 7 USPQ2d 1152 (Fed. Cir. 1988). Where all claims >for which reexamination was requested< are affected, the reexamination will be vacated by the *>CRU< Director. A non-final holding of claim invalidity or unenforceability, however, will not be controlling on the question of whether a substantial new question of patentability is present.

   (C) Specific Situations.

   For a discussion of the policy in specific situations where a Federal Court decision has been issued, see MPEP § 2642 >and subsection V. below<.

## III.  REEXAMINATION WITH CONCURRENT LITIGATION BUT ORDERED PRIOR TO FEDERAL COURT DECISION

   In view of the statutory mandate to make the determination on a request for reexamination within 3 months, the determination on the request based on the record before the examiner will be made without awaiting a decision by the Federal Court. It is not realistic to attempt to determine what issues will be treated by the Federal Court prior to the Court's decision. Accordingly, the determination on the request will be made without considering the issues allegedly before the Court. If reexamination is ordered, the reexamination generally (see discussion immediately below) will continue until the Office becomes aware that a court decision has issued. At such time, the request will be reviewed in accordance with the guidelines set forth below.

   In *Ethicon v. Quigg*, 849 F.2d 1422, 7 USPQ2d 1152 (Fed. Cir. 1988), the Court of Appeals for the Federal Circuit stated the following as to the Office's authority to stay a reexamination process pending the outcome of a Federal District Court case where invalidity is an issue:

   > "Whatever else special dispatch means, it does not admit of an indefinite suspension of reexamination proceedings pending conclusion of litigation. If it did, one would expect to find some intimation to that effect in the statute, for it would suggest the opposite of the ordinary meaning. But there is none."

   > "The Commissioner… has no inherent authority, only that which Congress gives. It did not give him authority to stay reexaminations; it told him to conduct them with special dispatch. Its silence about stays cannot be used to countermand that instruction."

   The *Ethicon* case was decided as to *ex parte* reexamination, for which 35 U.S.C. 305 dictates in its last sentence:

   > "All reexamination proceedings under this section, including any appeal to the Board of Patent Appeals and Interferences, will be conducted with special dispatch within the Office."

   For *inter partes* reexamination, however, 35 U.S.C. 314 states:

   > "**Unless otherwise provided by the Director for good cause,** all inter partes reexamination proceedings under this section, including any appeal to the Board of Patent Appeals and Interferences, shall be conducted with special dispatch within the Office."

   35 U.S.C. 314 *provides for inter partes* reexamination the clause "Unless otherwise provided by the Director for good cause" which clause is not present in 35 U.S.C. 305 for *ex parte* reexamination. Accordingly, where there is good cause for the Director of the USPTO to suspend (stay) reexamination proceedings pending the conclusion of litigation, a suspension will be effected. A "good cause" might be present, for

example, where there is an issue that cannot be decided in the reexamination proceeding but affects the resolution of the proceeding. Another example is where there is an issue common to the litigation and the reexamination that can best be decided in court due to the availability in court of discovery and subpoena power (e.g., an issue heavily dependent on presentation of conflicting/contested evidence by the two parties). >In addition, see subsection V. below for the situation where there is pending litigation having the potential to terminate a reexamination prosecution under 35 U.S.C. 317(b).< If the examiner believes there is "good cause" to suspend (stay) reexamination proceedings, the case should be brought to the Office of Patent Legal Administration (OPLA) for consideration of such by a Reexamination Legal Advisor (RLA). >See also subsection V. below.<

It should be noted that if, pursuant to 35 U.S.C. 318, a court stays litigation as to the patent being reexamined, action in the reexamination proceeding would not be suspended. This is so because action in the reexamination proceeding would be needed to resolve the "issue of patentability of any claims of the patent which are the subject of the *inter partes* reexamination order" set forth in 35 U.S.C. 318.

## IV. FEDERAL COURT DECISION ISSUES AFTER *INTER PARTES* REEXAMINATION ORDERED

Pursuant to 37 CFR 1.985(a), the patent owner in an *inter partes* reexamination proceeding must promptly notify the Office of any Federal Court decision involving the patent.

Upon the issuance of a holding of claim invalidity or unenforceability by a Federal Court, reexamination of those claims will <u>continue</u> in the Office <u>until</u> the decision becomes <u>final</u>. A *non-final* Court decision concerning a patent under reexamination shall have no binding effect on a reexamination proceeding.

Where an *inter partes* reexamination proceeding is currently pending and a **final** Federal Court decision issues after all appeals, the reexamination proceeding is reviewed to see if no substantial new question of patentability remains (as to one or more claims) due to holding of claims invalid, and to determine whether the provisions of 37 CFR 1.907(b) apply as a result of a decision in a civil action arising in whole or in part under 28 U.S.C. 1338.

A *final Court holding of invalidity/unenforceability* is binding on the Office. Upon the issuance of a final holding of invalidity or unenforceability, the claims held invalid or unenforceable will be withdrawn from consideration in the reexamination. The reexamination will continue as to any remaining claims. If <u>all</u> of the <u>claims</u> >being examined< are <u>finally</u> held <u>invalid or unenforceable</u>, the reexamination will be <u>vacated</u> by the *>CRU< Director as no longer containing a substantial new question of patentability and the reexamination prosecution will be terminated. If not all claims >being examined< were held invalid, a substantial new question of patentability may still exist as to the remaining claims. In such a situation, the remaining claims would be examined; and, as to the claims held invalid, form paragraph 26.80 should be used at the beginning of the Office action.

¶ *26.80 Claims Held Invalid by Court, No Longer Being Reexamined*

Claims **[1]** of the **[2]** patent are not being reexamined in view of the final decision of **[3]**. Claims **[1]** were held invalid by the **[4]**.

**Examiner Note:**
1.   In bracket 1, insert the claims held invalid.
2.   In bracket 2, insert the patentee (e.g., Rosenthal, Schor et al).
3.   In bracket 3, insert the decision (e.g., *ABC Corp. v. Kery Fries*, 999 USPQ2d 99 (Fed. Cir. 1999) or *XYZ Corp. v. Jones*, 999 USPQ2d 1024 (N.D. Cal. 1999)).
4.   In bracket 4, insert the name of the court (e.g., the Court of Appeals for the Federal Circuit, or the Federal District Court).

The issuance of a *final* Court decision (in a civil action arising in whole or in part under 28 U.S.C. 1338) upholding validity during an *inter partes* reexamination, where the person who filed the request **was a party to the litigation**, will have the effect that the Office will discontinue examination of all claims affected by the holding of validity. If the provisions of 37 CFR 1.907(b) apply such that all of the claims in the reexamination proceeding cannot be maintained, the order to reexamine is vacated by the *>CRU< Director, and reexamination is terminated. If the provisions of 37 CFR 1.907(b) apply to some of the claims, but not all of the claims in the proceeding; those claims to which 37 CFR 1.907(b) applies will not be treated. The examiner's action will point out the claims not treated, and the reason why those claims cannot be maintained in the reexamination under 37 CFR 1.907(b). Action will be given on the

remaining claims. Note that the provisions of 37 CFR 1.907(b) <u>cannot be waived</u> since they track the statute, 35 U.S.C. 317. >See also subsection V. below.<

The issuance of a final Court decision **upholding validity** during an *inter partes* reexamination, where the person who filed the request **was <u>not</u> a party to the litigation**, will have no binding effect on the examination of the reexamination. This is because the Court stated in *Ethicon v. Quigg*, 849 F.2d 1422, 1428, 7 USPQ2d 1152, 1157 (Fed. Cir. 1988) that the Office is not bound by a court's holding of patent validity and should continue the reexamination. The Court noted that District Courts and the Office use different standards of proof in determining invalidity, and thus, on the same evidence, could quite correctly come to different conclusions. Specifically, invalidity in a District Court must be shown by "clear and convincing" evidence, whereas in the Office it is sufficient to show non-patentability by a "preponderance" of the evidence. Since the "clear and convincing" standard is harder to satisfy than the "preponderance standard," a court's holding of patent validity is not controlling. Deference will, however, ordinarily be accorded to the factual findings of the court, where the evidence before the Office and the court is the same. If sufficient reasons are present, claims held valid by the court may be rejected in reexamination.

## V. >DISCUSSION OF AFFECT OF LITIGATION WHERE REQUESTER WAS A PARTY TO THE LITIGATION

For *inter partes* reexamination, 35 U.S.C. 317(b) provides:

> "Once a final decision has been entered against a party in a civil action arising in whole or in part under section 1338 of title 28, that the party has not sustained its burden of proving the invalidity of any patent claim in suit…, then neither that party nor its privies may thereafter request an *inter partes* reexamination **of any such patent claim** on the basis of issues which that party or its privies **raised or could have raised** in such civil action…, and an *inter partes* reexamination requested by that party or its privies **on the basis of such issues** may not thereafter be maintained by the Office, notwithstanding any other provision of this chapter. This subsection **does not prevent** the assertion of invalidity based on **newly discovered** prior art **unavailable** to the third-party requester and the Patent and Trademark Office at the time of the *inter partes* reexamination proceedings." [Emphasis added]

Where a final decision was entered against a party in a Federal Court civil action (arising in whole or in part under 28 U.S.C. 1338) that the party did not sustain its burden of proving invalidity of a patent claim in suit, then that party and its privies may not request *inter partes* reexamination of any such patent claim on the basis of issues which that party or its privies raised or could have raised in the civil action. Further, an *inter partes* reexamination already requested by that party, or its privies, on the basis of such issues will not be maintained by the Office; in such an instance, the prosecution will be terminated and the proceeding will be concluded. This is a statutory estoppel which can attach to an *inter partes* reexamination third party requester that is also a party to litigation concerning the patent for which reexamination has been requested.

35 U.S.C. 314(c) states:

> "**Unless otherwise provided by the Director for good cause**, all *inter partes* reexamination proceedings under this section, including any appeal to the Board of Patent Appeals and Interferences, shall be conducted with special dispatch within the Office." [Emphasis added]

The statute thus authorizes the Director of the USPTO to suspend (stay) reexamination proceedings, where there is good cause to do so, pending the conclusion of litigation based on a potential for termination of a reexamination prosecution under 35 U.S.C. 317(b). Thus, a District Court decision that is pending appeal on the validity of the same claims considered in an *inter partes* reexamination proceeding may provide the requisite statutory "good cause" for suspension, due to the real possibility that the 35 U.S.C. 317(b) estoppel may attach in the near future to bar/terminate the reexamination proceeding. Any such fact situation is resolved on a case-by-case basis.

In any *inter partes* reexamination where the requester (or its privies) is also a party to ongoing or concluded litigation as to the patent for which reexamination has been requested, the potential for this statutory estoppel to attach must be considered. The following provides a discussion of the interaction of 35 U.S.C. 317(b), 35 U.S.C. 314, and the *inter partes* reexamination process.

Congress, in creating the *inter partes* reexamination statutory framework in 2002, borrowed heavily from the existing *ex parte* reexamination regime. For example, *inter partes* reexamination proceedings, like

*ex parte* reexaminations, must be conducted with "special dispatch." 35 U.S.C. 314(c). Unlike *ex parte* reexamination, however, Congress provided the Office with the statutory authority and discretion to suspend *inter partes* reexamination proceedings for "good cause." See 35 U.S.C. 314(c).

Another difference between the two regimes is that Congress specifically provided estoppel provisions to shut down an *inter partes* reexamination of a patent claim when a "final decision" upholding the validity of that claim has been reached in a civil action or in a prior *inter partes* reexamination proceeding. See 35 U.S.C. 317(b); 35 U.S.C. 315(c). Thus, if a party's challenge to the validity of certain patent claims has been <u>finally resolved</u>, either through civil litigation or the *inter partes* reexamination process, then (A) that party is barred from making a subsequent request for *inter partes* reexamination (or filing a new civil action) challenging the validity of those same claims, <u>and</u> (B) "an *inter partes* reexamination previously requested by that party or its privies on the basis of such issues may not thereafter be maintained by the Office." *Id*.

The statute and legislative history of the estoppel provisions make it clear that the *inter partes* reexamination of a claim (requested by a party) must be terminated once a final decision upholding the validity of that claim (challenged by the same party) has issued "after any appeals," not simply just after a district court decision which is still pending on appeal. While Congress desired that the creation of an *inter partes* reexamination option would lead to a reduction in expensive patent litigation, it nonetheless also provided <u>in the statute</u> that a court validity challenge and *inter partes* reexamination of a patent may occur simultaneously; but once one proceeding <u>finally ends</u> in a manner adverse to a third party, then the issues raised (or that could have been raised) with respect to the validity of a claim in that proceeding would have estoppel effect on the same issues in the other proceeding.

Taking the above into account, <u>the following factors are to be considered</u> in determining whether it is appropriate to refuse to order an *inter partes* reexamination, terminate the reexamination, or suspend action in the reexamination, based on litigation in which the reexamination requester is a party to the litigation.

(A) The 35 U.S.C. 317(b) estoppel applies only to patent claims that were litigated in the suit, i.e., litigated claims. The estoppel does not apply to non-litigated claims.

Where there are non-litigated claims for which reexamination had been requested in the *inter partes* reexamination request, the reexamination proceeding is to go forward based on those non-litigated claims. If, however, during the reexamination proceeding, the patent owner disclaimed all the non-litigated claims, leaving only litigated claims, the proceeding is to be referred to the Office of Patent Legal Administration (OPLA).

(B) The 35 U.S.C. 317(b) estoppel applies only to issues which the requester or its privies raised or could have raised in the civil action. The estoppel does not apply where new issues are raised in the request.

If the request provides new art/issues not raised in the litigation (civil action), and which could not have been so raised, then estoppel does not attach. The patent owner has the burden of showing that the art and issues applied in the request was available to the third-party requester and could have been placed in the litigation.

(C) The 35 U.S.C. 317(b) estoppel applies only in a situation where a final decision adverse to the requester has already been issued.

If there remains any time for an appeal, or a request for reconsideration, from a court (e.g., District Court or Federal Circuit) decision, or such action has already been taken, then the decision is not final, and the estoppel does not attach. A stay/suspension of action may be appropriate for the reexamination proceeding if the litigation has advanced to a late enough stage and there is sufficient probability that a final decision will be adverse to the requester; however, that is a matter to be discussed with the OPLA in any such instance.

(D) Is there a concurrent *ex parte* reexamination proceeding for the patent?

As stated in MPEP § 2286: "The issuance of a final Federal Court decision upholding validity during an *ex parte* reexamination also will have no binding effect on the examination of the reexamination. This is because the court states in *Ethicon v. Quigg*, 849 F.2d 1422, 1428, 7 USPQ2d 1152, 1157 (Fed. Cir. 1988) that the Office is not bound by a court's holding

of patent validity and should continue the reexamination." If there is a concurrent *ex parte* reexamination proceeding having overlapping issues with an *inter partes* reexamination proceeding where the estoppel has the potential to attach, but no final decision has been issued, then the Office may in some instances (depending on the individual facts and circumstances), to go forward with statutorily required "special dispatch" as per *Ethicon* in a merged proceeding containing both the *inter partes* reexamination and the *ex parte* reexamination. This is a matter of administrative convenience to avoid rework and make the process more efficient. Again, OPLA should be consulted.

(E) Some examples of where this estoppel issue was actually addressed by the Office.

In reexamination control numbers 95/000,093 and 95/000,094 (the '093 and '094 proceedings), action was suspended based on ongoing litigation. After a District Court decision adverse to requester, it was determined that "good cause" existed to wait for the outcome of the Federal Circuit appeal, because the reexamination proceedings were only at their beginning stages, while the concurrent litigation was potentially near its final resolution. It was noted that requester had chosen to permit the District Court litigation to proceed for three years before filing its requests for reexamination, the filing taking place only after judgment was entered in patent owner's favor in the litigation. Had requester filed its requests for reexamination earlier, the reexamination proceedings would have been much farther along in the process, and may likely have been completed at the Office before the District Court issued its decision. Moreover, had requester filed its reexamination requests earlier in the litigation, the District Court might have stayed the litigation to await the Office's decisions in the two reexamination proceedings. After choosing to go years through the entire District Court litigation proceeding without asking for the Office's input, requester was not in a position to complain that a suspension of the '093 and '094 proceedings would deprive requester of a chance to obtain the Office's decision, when there was a strong possibility that the Federal Circuit's decision would estop the Office from issuing any decision at all. In short, requester could not have it both ways. Requester waited three years after the district court

case began, and waited until after the District Court issued a final decision, such that its District Court litigation could in no way be affected by any decision on its reexamination requests. Requester's delay was the reason that the '093 and '094 reexaminations could very well be mooted before any reexamination decision issued and the USPTO Director found "good cause" to suspend the proceedings. Requester chose its route and had to deal with the consequences of its decision, i.e., a suspension of the reexamination proceedings.

On the other hand, see reexamination control numbers 95/000,020, 95/000,071 and 95/000,072, for decisions in which action was not suspended, because the specific facts dictated otherwise.

## VI. < LITIGATION REVIEW AND CRU APPROVAL

In order to ensure that the Office is aware of prior or concurrent litigation, the examiner is responsible for conducting a reasonable investigation for evidence as to whether the patent for which reexamination is requested has been, or is, involved in litigation. The investigation will include a review of the reexamination file, the patent file, and the results of the litigation computer search by the Scientific and Technical Information Center (STIC). If the examiner discovers, at any time during the reexamination proceeding, that there is litigation or that there has been a Federal Court decision on the patent, the fact will be brought to the attention of a Reexamination Legal Advisor (RLA) of the **>OPLA< prior to *any* further action by the examiner. The RLA will provide the examiner with guidance as to compliance with Office policy where there is concurrent litigation.

## 2687 Notice of Intent to Issue *Inter Partes* Reexamination Certificate (NIRC) and Conclusion of Reexamination Proceeding [R-5]

Upon conclusion of the *inter partes* reexamination proceeding, the examiner must complete a Notice of Intent to Issue *Inter Partes* Reexamination Certificate (NIRC) by filling out Form PTOL-2068. If appropriate, an examiner's amendment will also be prepared. Where the claims are found patentable, reasons must be given for each claim found patentable. See the dis-